G.K.A. BEVERAGE CORP.; Staten Island Beverage Corp.; Clover Beverage Dist. Corp.; Prince Beverage Dist. Corporation; Gicci Beverage Corporation; V. Iocolano Distribution Corporation; R–Ket Corporation; P. Lautao Corporation; Vin–Mare Distribution Corporation; Manuel Nieves Limited; Vincent Lautato Corporation; Rockville Distribution Corporation; Lynvey Beverage Corporation; PA Distribution Corporation; Starlite Beverage Corporation; 396 6th Avenue Systems Corp.; Rapitz Beverage Corporation; Rinda Beverage Corporation; R & E Wolderich Corporation; Windy Hills Corp.; Victoria Heights Corporation; Domino Beverage Corporation; Westerleigh Beverage Corporation; Quinco Beverage Corporation; Rodan Beverage Corporation; Kare–Fre Beverage Corporation; By Sum Beverage Corporation; Breit Distribution Corporation; Titan Beverage Corporation; Lundon Beverage Distribution Corporation; El–Len Beverage Corporation; Scognamiglio Beverage Corporation; Joseph Cauciella, Inc.; Breitinger Distribution Corporation; Filmar Distribution Limited; J. Mulvey Distribution Corporation; R.A.E. Beverage Corporation; Three Guys Distribution Corporation; Kenneth Steffens Corporation; John Boehler Corporation; Roe Beverage Corporation; Delta Sigma Corporation; Moe's Beverage Corporation; Barbaro 7–Up Distribution Corporation; Gumby Beverage Corporation; Big Dan's Beverage Corporation; Ballato Beverage Corporation; JPM Beverage Corporation; Miller Beverage Corporation; Matty Casamassina Corporation; Del Beverage Corporation; Jerijo Corporation; K & M Beverage Distribu-tion Corporation; Ace Metro Beverage Corporation; Day Layt Distribution Corporation; Frank MacCorone Corporation; Jentine Beverage Corporation; F.C.L. Beverage Corporation; Twin East Beverage Corporation; Eugene & Michael Parine Corporation; Orlino Beverage Corporation; Lar–Tis Ltd. Corp.; James Quartararo Corporation; Quality Beverage Corporation; M & A Tisbo Limited; G & C Fava Corporation; P.A.L. Beverage Corporation; Albanese Beverage Corporation; Rosario Panebianco; Frank Scarano; Joe Decostanzo; Frank Grasso; Jerry Bilotti; Robert Rich; Raymond Levasseur; Mike Christina; Linda Vitiello; Lillian Bagielto; Antoinette M. Gambino; William Rottkamp; Richard E. Miskovsky; Norman Walmsley; Conrad Panza; Nicholas J. Fortuna; Frederick J. Ludwig; Michael Hubbard; Jack Quartararo; Mary Ellen Taffo; and Bart Simone, Plaintiffs–Appellants,

v.

Harold HONICKMAN; Dr. Pepper/Seven–Up Companies, Inc.; Dr. Pepper/Seven–Up Corporation; and Lance T. Funston, Defendants–Appellees.

No. 421, Docket 94–7200.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 1994.

Decided June 1, 1995.

Thomas A. Holman, New York City (Louis Wollin, Lefrak & Holman, New York City, Kenneth F. McCallion, Barbara J. Hart, Goodkind Labaton Rudoff & Sucharow, New York City, Peter McCallion, Garrison, NY, of counsel), for plaintiffs-appellants G.K.A. Beverage Corp., et al.

Richard E. Bennett, New York City, for plaintiffs-appellants Lundon Beverage Distribution Corp., J. Mulvey Distribution Corp., Moe's Beverage Corp., and Day Layt Distribution Corp.

Peter E. Greene, New York City (Peter S. Julian, Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel), for defendant-appellee Harold Honickman.

Philip D. Bartz, Washington, DC (Leslie J. Cloutier, Morrison & Foerster, Washington, DC, Mark P. Ladner, Morrison & Foerster, New York City, of counsel), for defendants-appellees Dr. Pepper/Seven–Up Companies, Inc. and Dr. Pepper/Seven–Up Corp.

David A. Robinson, New York City, for defendant-appellee Lance T. Funston.

Before: KEARSE and WINTER, Circuit Judges, and CONNER,* District Judge.

WINTER, Circuit Judge:

Eighty-nine former distributors of Seven–Up soft drinks and other beverages (the "distributors") appeal from Judge Glasser's dismissal of their complaint alleging claims for violation of state and federal antitrust laws and interference with contractual relations. The distributors contend that the appellees, Dr. Pepper/Seven–Up Companies, Inc. and Dr. Pepper/Seven–Up Corporation (collectively "Dr. Pepper/Seven–Up"), Harold Honickman ("Honickman") and Lance T. Funston ("Funston") intentionally forced Seven–Up Brooklyn Bottling Company, Inc. ("Seven–Up Brooklyn") out of business in order to drive the distributors out of business and permit defendant Honickman to reacquire Seven–Up Brooklyn's assets free and clear of distribution agreements with the plaintiffs. This conduct, they argue, entitles them to relief under the antitrust laws. We affirm the district court's dismissal of the antitrust claims on the ground that the distributors lack antitrust standing. We also affirm the district court's dismissal on the merits of the state law claims for interference with contractual relations.

## BACKGROUND

■ Because this appeal is from a Fed. R.Civ.P. 12(b)(6) dismissal for failure to state a claim upon which relief can be granted, we assume the allegations of the amended complaint to be true.

We begin with a brief description of the complaint's allegations concerning the structure of the soft drink industry and the role of the parties in that structure. Parent concentrate companies such as Dr. Pepper/Seven–Up sell syrup or concentrate to bottling companies, such as Seven–Up Brooklyn. The bottling companies obtain licenses to use that syrup or concentrate in bottling and distributing soft drinks in specified geographical areas. In the early 1990s, there were three bottlers in the New York City area: (i) the Coca–Cola Bottling Company of New York, which distributed Coca–Cola brands; (ii) Honickman, who sold the products of Pepsi-Co., Inc., and other brands such as Canada Dry; and (iii) Seven–Up Brooklyn and Seven–Up Bottling Company of New York. Seven–Up Brooklyn had contracts with independent truck drivers—the plaintiff distributors—who paid Seven–Up Brooklyn for exclusive territorial rights to distribute its soft drinks to retail establishments.

Honickman entered the soft drink industry in 1977 and over time acquired numerous bottling companies. Without including the Seven–Up brands, which are the subject of this litigation, Honickman is alleged to control the sale to retailers of over half of the carbonated soft drinks in New York City. When the Seven–Up brands are included, Honickman is alleged to control 64 percent of that market. The combined market share of Honickman's companies and the one other large competitor in the bottling of carbonated soft drinks, Coca–Cola Bottling Company of New York, is alleged to constitute 95 percent of the carbonated soft drink market in New York City. Honickman does not presently use independent drivers to distribute its products but rather employs drivers directly.

We turn now to the events that gave rise to this litigation. In July 1987, Long Island Acquisition Company ("LIA"), a partnership in which Honickman and members of his family held a 52 percent share and Funston a

---

* The Honorable William C. Conner, Judge, United States District Court for the Southern District of New York, sitting by designation.

48 percent share, acquired all of Seven–Up Brooklyn's non-cola soft drink franchise rights, vehicles, vending machines, and related equipment. The complaint alleges that this transaction was facilitated by either a cash contribution or a loan guarantee from Canada Dry Bottling of New York, a Honickman-owned company. Seven–Up Brooklyn's plant in Melville, New York was acquired by Melville Business Partners L.P., a partnership of which the general and managing partner was Honickman and the six limited partners were his two children and four employees of Honickman-owned companies. Berriman Cozine Corporation, owned by Honickman's brother-in-law, purchased Seven–Up Brooklyn's facility in Brooklyn. According to the complaint, these acquisitions were financed largely by credit guarantees made by Honickman and Honickman-owned companies. Following the consummation of these transactions, LIA leased the Melville and Brooklyn facilities from their new owners.

Honickman's control of Seven–Up Brooklyn caused the Federal Trade Commission ("FTC") to investigate the anticompetitive effects of the acquisition. In late 1988, to avoid a legal dispute with the FTC, Honickman and his family sold their interest in LIA, which held the operating assets of Seven–Up Brooklyn, to Funston. However, the complaint alleges that Honickman remained secretly in control of Seven–Up Brooklyn and that the assets were transferred in such a way that Honickman could later reclaim them.

In November 1989, the FTC issued an administrative complaint challenging Honickman's acquisition of Seven–Up Brooklyn. Honickman subsequently entered into an agreement with the FTC providing that, for a period of ten years, Honickman would not acquire, directly or indirectly, any interest in any carbonated soft drink bottling operation in the New York metropolitan area without the prior approval of the FTC. Nevertheless, according to the complaint, Honickman and Funston secretly intended to cause Seven–Up Brooklyn to fail so that Honickman could reacquire it and counter any antitrust charges with the failing company defense. That defense permits an otherwise unlawful acquisition where the acquiree will go out of business if the acquisition is forbidden. *See* H.R.Rep. No. 1191, 81st Cong., 1st Sess. 6 (1949); S.Rep. No. 1775, 81st Cong., 2d Sess. 7 (1950); *see also International Shoe v. FTC,* 280 U.S. 291, 302–03, 50 S.Ct. 89, 93, 74 L.Ed. 431 (1930); 4 Phillip Areeda & Donald F. Turner, *Antitrust Law,* §§ 924–931 (1978).

In October 1990, Seven–Up Brooklyn did in fact fail, filing a petition for Chapter 11 bankruptcy reorganization after a bank cancelled a line of credit. Thereafter, Seven–Up Brooklyn filed an application in the bankruptcy court for an order setting a hearing date to consider the sale of the company's assets. The application included a draft agreement pursuant to which Honickman would purchase Seven–Up Brooklyn's existing inventory, and a division of Dr. Pepper/Seven–Up would purchase Seven–Up Brooklyn's remaining franchise assets, which it in turn would sell to Honickman. At the bankruptcy court hearing, there were two bidders for the company's assets: Kenneth Kraus and the combination of Dr. Pepper/Seven–Up and Honickman.

The distributors favored the Kraus offer, which contemplated the continued operation of Seven–Up Brooklyn as a separate entity. At the hearing, the distributors alleged that Honickman, Funston, and Dr. Pepper/Seven–Up had conspired to rig the bidding in order to obtain market power in the carbonated soft drink market and had conducted a sham investigation to show falsely the lack of other qualified buyers. The bankruptcy court rejected both proposals and terminated Seven–Up Brooklyn's authority to use cash collateral. At a later hearing, according to the complaint, Dr. Pepper/Seven–Up represented to the bankruptcy court that Seven–Up Brooklyn was liable to it for more than a million dollars, and that any successor to Seven–Up Brooklyn would immediately be sued for this amount. According to the complaint, this discouraged the only other bidder from pursuing the acquisition of Seven–Up Brooklyn and allowed Honickman ultimately to make a successful bid. The bankruptcy court's order approving the acquisition of the assets of Seven–Up Brooklyn by Honickman was not appealed.

The FTC initially denied approval of the sale to Honickman on the ground that it failed to satisfy the failing company defense. Later, the FTC relented, permitting Honickman to acquire licenses from Dr. Pepper/Seven–Up and to distribute the soft drink brands formerly bottled by Seven–Up Brooklyn.

The distributors' complaint alleged that Honickman's efforts to acquire Seven–Up Brooklyn's non-cola bottling assets constituted monopolization of the carbonated soft drink market in New York City and intentional interference with present and prospective contractual relations.

The district court held that the claims were barred by the doctrine of res judicata, because the distributors' claims were "based essentially on the same factual issues that they raised before the bankruptcy court," but simply alleged new legal theories. As alternative grounds for the dismissal of the complaint, the district court held that: (i) the distributors failed to allege the type of antitrust injury necessary to confer standing to maintain a suit under the antitrust laws; (ii) the distributors' claim for tortious interference with present contractual relations failed because the distributors did not allege that Honickman's conduct proximately caused Seven–Up Brooklyn to breach its contract with the distributors; and (iii) the distributors' claim for tortious interference with prospective contractual relations failed because the distributors had not alleged that Honickman had taken any action with respect to the third parties with whom the distributors claimed to have had prospective relationships.

This appeal followed.

## DISCUSSION

The distributors' complaint alleged three distinct claims for violation of state and federal antitrust laws: (i) that appellees conspired to eliminate both the distributors and Seven–Up Brooklyn as competitors, in order to monopolize the carbonated soft drink market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (ii) that appellees conspired to restrain trade in order to monopolize the carbonated soft drink market at the bottler and distribution level, in violation of the Donnelly Act, N.Y.Gen.Bus.Law § 340; and (iii) that appellees attempted to monopolize the New York carbonated soft drink market, also in violation of Section 2 of the Sherman Act. We conclude that all three antitrust claims are barred because the distributors lack antitrust standing.

■ Antitrust injury is necessary, but not sufficient, for antitrust standing. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427 (1986). Although antitrust standing analysis often includes additional factors, *id.* at 111 n. 6, 107 S.Ct. at 490 n. 6; *see also Volvo N. Am. Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 66 (2d Cir.1988) (setting forth factors comprising antitrust standing analysis), the issue of antitrust injury is dispositive in the instant case.

■ We believe that the distributors do not have standing to bring an antitrust claim against defendants because the distributors have not alleged an antitrust injury. Their antitrust claims essentially boil down to the contention that Honickman, Funston, and Dr. Pepper/Seven–Up conspired to destroy Seven–Up Brooklyn through predatory practices and, in doing so, eliminated the distributors' contractual rights with Seven–Up Brooklyn to market soft drinks at the retail level. For this elimination of contractual rights to be antitrust injury, it must constitute the kind of injury that the antitrust laws were directed at. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977). However, "[m]erely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing." *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir.1987). It follows naturally that a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing. *See, e.g., Lovett v. General Motors Corp.*, 975 F.2d 518, 521 (8th Cir.1992) (deny-

ing antitrust standing to sole shareholder where only alleged injury stemmed from failure of corporation), *cert. denied,* —— U.S. ——, 114 S.Ct. 1058, 127 L.Ed.2d 378 (1994); *Sharp v. United Airlines, Inc.,* 967 F.2d 404, 407–08 (10th Cir.) (denying antitrust standing to employees where only alleged injury stemmed from failure of corporation), *cert. denied,* —— U.S. ——, 113 S.Ct. 464, 121 L.Ed.2d 372 (1992).

If Seven–Up Brooklyn, before its bankruptcy, had cancelled its distribution agreements and hired delivery drivers as employees, the distributors would not have been able to assert an antitrust violation. Lacking such a claim against Seven–Up Brooklyn, the distributors also lack a claim against Honickman, Funston, and Dr. Pepper/Seven–Up, who, having taken over Seven–Up Brooklyn's business, have not hired the plaintiffs as distributors.

Although the distributors undoubtedly suffered injury as a result of the alleged antitrust violation, the injury suffered by the distributors is derivative of the injury suffered by Seven–Up Brooklyn. Thus, accepting the antitrust allegations as true, it was not the distributors that suffered direct antitrust injury, but Seven–Up Brooklyn. Therefore, the proper party to bring the antitrust action on these facts was Seven–Up Brooklyn, or, after its bankruptcy, the estate's trustee.

In *A.G.S. Electronics, Ltd. v. B.S.R. (U.S.A.), Ltd.,* 460 F.Supp. 707 (S.D.N.Y.), *aff'd,* 591 F.2d 1329 (2d Cir.1978), a manufacturer of record players acquired another manufacturer, thereby allegedly monopolizing the market. The acquiring manufacturer then terminated an exclusive distributorship contract which the acquired manufacturer had with the plaintiff. The court held that the terminated distributor lacked standing to assert an antitrust claim because the injuries "all flow from the termination of its distributorship rather than any anticompetitive effects of the defendants' acquisition of [the second manufacturer]." *Id.* at 710. We believe that the same result is mandated in the instant case.

■ The distributors attempt to recharacterize their antitrust claims by arguing that they suffered antitrust injury in the elimination of competition in retail distribution between themselves and Honickman. However, the so-called "distribution monopoly" is derived entirely from Honickman's share of the bottling market. Honickman's "distribution monopoly" thus involves only his product. Moreover, a vertically structured monopoly can take only one monopoly profit. *See Lamoille Valley R.R. v. ICC,* 711 F.2d 295, 318 (D.C.Cir.1983); *see also* Robert H. Bork, *The Antitrust Paradox* 229 (2d ed. 1993); 3 Phillip Areeda & Donald F. Turner, *Antitrust Law* § 725b (1978). If, as alleged, appellees successfully conspired to monopolize soft drink bottling in the New York area, they could reap no additional gain from monopolizing the retail distribution of soft drinks. If a monopolist at the distribution level were to restrict output to maximize profit, the restriction would deprive the monopolist at the bottling level of its maximizing output and price. Once having achieved the alleged bottling monopoly, therefore, appellees' sole incentive is to select the cheapest method of distribution. *See Byars v. Bluff City News Co.,* 609 F.2d 843, 861 (6th Cir.1979). The distributors are thus free to offer their services to appellees, who have no incentive to reject the offer if it is more economical than use of their employees, and consumers of soft drinks will benefit from this competition.

■ The distributors' claim for tortious interference with contractual relations was also properly dismissed by the district court. The distributors allege that appellees intentionally interfered with Seven–Up Brooklyn's performance of the distribution contracts. Under New York law, there are four elements to the tort of intentional interference with contractual relations: (i) existence of a valid contract; (ii) defendant's knowledge of that contract; (iii) defendant's intentional procurement of the breach of that contract; and (iv) damages caused by the breach. *See Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289, 292 (1993).

■ We believe that appellants' allegations fail to show that appellees had the requisite intent with regard to procuring the breach of Seven–Up Brooklyn's contracts

with appellants. Nothing in the allegations may reasonably be read to suggest that the target of appellees' conduct was Seven–Up Brooklyn's contractual arrangements with appellants, any more than the target was Seven–Up Brooklyn's contracts with phone or electric companies. As alleged, Honickman's sole interest was to achieve the soft-drink bottling monopoly, and the distribution system utilized by the target of his allegedly predatory behavior was irrelevant to that goal.

■ The distributors' claim for tortious interference with prospective business relations was also properly dismissed by the district court for failure to state a claim. To prevail on this claim, under New York law, "a plaintiff must demonstrate that the defendant interfered with business relations existing between a plaintiff and a third party, either with the purpose of harming the plaintiff or by means that are dishonest, unfair, or improper." *Volvo N. Am. Corp.*, 857 F.2d at 74. The distributors contend that appellees interfered with their relationships with retailers and other final purchasers of soft drinks. As noted, however, appellees' alleged goal was to obtain a monopoly in bottling, and the distributors' relationship with their retail customers is irrelevant to that goal. The distributors thus make no allegations that appellees had any contact with the distributors' customers or that appellees tried to convince the customers to make contracts with them rather than the distributors. It is axiomatic that, in order to prevail on this claim, the distributors would have to show that the appellees intentionally caused the retailers not to enter into a contractual relation with them. *See Marilyn Miglin, Inc. v. Gottex Indus.*, 790 F.Supp. 1245, 1254 (S.D.N.Y.1992); *see also Volvo N. Am. Corp.*, 857 F.2d at 74. The distributors cannot allege such intentional interference, and their claim therefore fails.

## CONCLUSION

For the foregoing reasons, we affirm the dismissal of the complaint.