**Mark A. D'ANDREA, Plaintiff,**

v.

**Sameer RAFLA–DEMETRIOUS, Methodist Hospital of Brooklyn, the American Board of Radiology, Kenneth L. Krabbenhoft, in his capacities as Secretary and Executive Director of the American Board of Radiology, Defendants.**

No. 92–CV–2783 (JG).

United States District Court, E.D. New York.

March 25, 1996.

Steven Horowitz, New York City, for Plaintiff.

Mark J. Aaronson, Lee S. Siegel, Aaronson Rappaport Feinstein & Deutsch, New York City, for Defendants.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

Plaintiff, Mark A. D'Andrea ("D'Andrea"), was a medical resident at Methodist Hospital of Brooklyn ("Methodist"), under the supervision of Dr. Sameer Rafla–Demetrious ("Rafla"). D'Andrea brought this action against Methodist and Rafla claiming that during the course of his residency in Methodist's Department of Radiation Oncology ("DRO"), Methodist invaded his privacy and that Rafla and Methodist (1) breached the contract between Methodist and D'Andrea; (2) tortiously interfered with D'Andrea's contract with the American Board of Radiology ("ABR"); (3) tortiously interfered with D'Andrea's prospective economic gain; and (4) committed a prima facie tort.[1] Rafla and Methodist have moved for summary judgment on all claims against them.[2] For the reasons stated herein, defendants' motion is granted with regard to all claims except the invasion of privacy claim.

### FACTS

In January 1986, shortly after graduating from medical school, D'Andrea entered into a contract with Methodist, a large teaching and research institution in the Park Slope area of Brooklyn, New York. Under this contract, D'Andrea was to begin a three-year residency program at Methodist on July 1, 1986, in the DRO, and upon D'Andrea's completion of Methodist's program, on June 30, 1989, the hospital would issue him an appropriate "certificate of satisfactory completion." This residency program was directed by Rafla, who was responsible for both issuing the completion certificates and reporting to the ABR on a resident's fitness for certification by the ABR.

Before examining and certifying residents for the subspecialty of radiation oncology, the ABR required all candidates to submit an evaluation from their program directors. However, a satisfactory evaluation from one's program director did not necessarily mean that a candidate was qualified for ABR examination and certification. The ABR had its own prerequisites to examining and certifying physicians, which sometimes were more stringent than the requirements of residency

---

1. D'Andrea has voluntarily withdrawn all claims against the ABR and Krabbenhoft.

2. Defendants also assert the affirmative defense of qualified immunity, which plaintiff claims was waived. It is not necessary to determine whether defendants waived this defense because their motion for summary judgment is granted on other grounds.

programs, and it was within the sole discretion of the ABR to determine whether a candidate was fit for examination and certification. For example, the Methodist program allowed residents to take at least forty-four paid days off per year, while the ABR permitted a resident to accrue only thirty days off per year.

In his first year as a resident, D'Andrea received what Rafla considered substandard evaluations from the physicians for whom he worked. During this year, D'Andrea had been evaluated by attending physicians Youssef and Parikh, who rated him on a battery of characteristics generally as "fair" or "good," with only an occasional "very good," on a scale of "poor," "fair," "good," "very good," and "outstanding." Moreover, D'Andrea performed poorly on internal Methodist examinations. During this year, Rafla warned D'Andrea in two formal letters that his patient care, internal exam performance, and professional conduct were substandard, and he encouraged D'Andrea to improve. During this time, D'Andrea, by his own admission, was "moonlighting" at another hospital without the approval of Rafla, which was prohibited in his contract with Methodist.

In D'Andrea's second year of his residency, he continued to moonlight at another hospital without Rafla's approval and, by his own admission, took 50 days off. In the third year of his residency, D'Andrea continued moonlighting and has admitted to taking 60 days off. In fact, D'Andrea admitted to operating his own private medical practice in Harlem and devoting at least six hours per week to this practice. It is not surprising, therefore, that in D'Andrea's second year, one physician rated D'Andrea's performance as "marginal" on "availability and punctuality."

Early in the second year of his residency, in September 1987, D'Andrea applied for ABR certification in therapeutic radiology.

In accordance with its customary procedure, the ABR sought Rafla's opinion as to whether D'Andrea would achieve adequate professional qualifications to be certified by the ABR and be prepared for the oral examination in radiation oncology at the end of his residency in June 1989. In February 1988, Rafla verified that D'Andrea would attain adequate professional qualifications.

In October 1988, D'Andrea took the written portion of the ABR examination and failed, scoring in only the twelfth percentile on the clinical oncology portion. In February 1989, D'Andrea applied again to take the ABR written examination, and the ABR again sought Rafla's opinion. This time, at the ABR's request for information regarding D'Andrea's absences from the residency program, Rafla informed the ABR by telephone and letter that D'Andrea had been out for a total of 102 days in 1988[3]—a figure which had been given to Rafla by Katherine Saleh, an administrator responsible for keeping daily records of residents' whereabouts. Before reporting these absences to the ABR, Rafla instructed Saleh to "be sure of your facts." Despite this admonition, Saleh's figure was wrong; D'Andrea was actually absent for 81.5 days according to Methodist's records during 1988.[4]

Shortly after Rafla's letter and telephone call, the ABR apparently became concerned about D'Andrea's absences. It sent a letter to him immediately after he applied for examination and certification, informing him that his absences exceeded that allowed under ABR policy. At this point, D'Andrea directed Saleh to inform the ABR that Rafla was mistaken and that he had only taken off 77, not 102, days during 1988. Saleh did so. Several letters were sent back and forth between the ABR and either D'Andrea or Saleh, all relating to whether the ABR would allow D'Andrea to take the oral examination and eventually become certified. In one letter sent by Saleh at the direction of D'An-

3. According to a note apparently typed following a telephone conversation between Rafla and the ABR, Rafla stated that he informed D'Andrea of the excessive absences and mentioned making up this time, but D'Andrea was not concerned.

4. These were D'Andrea's total absences for 1988. Therefore, they were accumulated during the second half of D'Andrea's second residency year and the first half of his third residency year. D'Andrea now disputes only 2.5 of these absences.

drea, Saleh informed the ABR that from the beginning of D'Andrea's residency to that date, D'Andrea had taken 98 days off.[5] Rafla was not involved in this correspondence.

Finally, in April 1989, the ABR notified D'Andrea that he had accumulated an excessive number of days off, and that its policy was to require 34 days of additional residency training to compensate for his absences before it would administer the oral portion of the certifying examination to him. The ABR informed D'Andrea that based on the information Saleh and D'Andrea had provided, he had taken more than 30 days off per year in contravention of ABR policy. However, D'Andrea attempted through May 1989 to persuade the ABR to allow him to take the examination anyway and sent letters to the ABR trying to explain his absences.

At the end of May 1989, the ABR contacted Rafla for clarification on D'Andrea's absences and his opinion as to whether D'Andrea would fulfill his residency requirements by June 1989, as originally planned. On June 12, 1989, Rafla wrote to the ABR as follows:

> In answer to your question regarding the assessment of Dr. D'Andrea I have reviewed his performance during his training and discussed the matter extensively with all the clinical mentors, including those in other departments through which he rotated (surgery, pathology).

> In my opinion this resident needs a further training period of 4 months beyond June 30, 1989. This decision is based on the following:

> 1. Excessive absence from the program in 1988 numbering at least 102 working days.

> 2. Poor attendance and performance in some of the rotations—in surgery, the Director of the program, refused to certify the month.

> 3. Dr. D'Andrea declined to take necessary steps for rotation in Pediatric Radiation Oncology as planned in the program. He insisted upon

spending the month of June 1989 in clinical research. Despite the fact that guidelines were clearly communicated to him in writing, he absented himself from the department for the first week of June, prompting a telegram of stiff warning to him.

> I recommend that part of this 4 month period be spent in Pediatrics training.

(Defendant's Mem. of Law, Ex. GG; hereinafter referred to as "the June 12 letter"). In the June 12 letter, Rafla also advised the ABR that any information it had received to the contrary from Saleh or D'Andrea was sent without his authorization. Finally, Rafla informed the ABR that D'Andrea's absences had adversely affected his training and he had performed poorly in his evaluations and examinations at Methodist.

On the same day that he wrote the above-described letter to the ABR, Rafla wrote a memorandum of reprimand to Saleh and D'Andrea's personnel files. The memorandum described Saleh's unauthorized transmission of information to the ABR in violation of department rules, and a further transgression—the unauthorized appearance of Rafla's signature on one of the pages Saleh sent to the ABR. It also described subsequent conversations Rafla had had with Saleh and D'Andrea about their misconduct. The memorandum stated that D'Andrea had admitted his responsibility for the unauthorized use of Rafla's signature but had claimed that the page containing it had not been sent. Rafla's memorandum concluded:

> Dr. D'Andrea's behavior and action were most reprehensible and vergying [sic] on dishonesty. That will be part of his record.

On June 16, 1989, the ABR wrote to D'Andrea stating that based on the June 12 letter, D'Andrea would be required to train for four additional months after the official end of his residency on June 30, 1989, before being able to take the ABR oral examination and become ABR certified. The ABR told D'Andrea that he should notify the ABR office upon completing his additional training.

---

**5.** In his deposition, D'Andrea admitted that he actually had taken 111 days off since the beginning of his residency.

Ten days later, D'Andrea was awarded a hospital certificate stating:

> This is to certify that Mark A. D'Andrea, M.D. has served as Resident in Radiation Oncology at this hospital from July 1, 1986 through June 30, 1989.

Rather than complete the additional four months of training at Methodist, however, D'Andrea left Methodist on June 20, 1989, ten days before the end of his three-year residency, to take a Texas licensing examination in Austin. He then went to Tyler, Texas where, on June 26, he signed an employment contract with A. Lee Schlichtemeier, M.D., a radiation oncologist, and began working. D'Andrea worked with Dr. Schlichtemeier from June 26, 1989, through September, 1991, earning $130,000, $180,000 and $250,000 in each successive year. In October 1989, a few months after leaving Methodist, D'Andrea sat for and failed the ABR's written examination a second time. Finally, on his third try, in February 1990, D'Andrea passed the ABR written examination. From October 1991, through January 1992, he lived in Galveston, Texas and completed his additional four months of training for the ABR oral examination and certification. In June 1992, the ABR allowed D'Andrea to take the oral examination, which he failed. He then returned to Tyler to resume his employment with Dr. Schlichtemeier.

On June 11, 1992, D'Andrea filed this claim against Rafla and Methodist claiming that Rafla's statements in the June 12 letter to the ABR concerning plaintiff's preparation for the board examination, and the issuance of a certificate that did not indicate that plaintiff had satisfactorily completed the residency program both support four causes of action: (1) breach of contract; (2) tortious interference of contract; (3) tortious interference with prospective economic gain; and (4) prima facie tort. D'Andrea also claims that Methodist invaded D'Andrea's privacy when it printed a picture of him in its medical residency recruitment brochure. Rafla and Methodist have moved for summary judgment.

## *DISCUSSION*

### A. *The Standard For Summary Judgment*

Summary judgment may not be granted "unless the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to demonstrate that no genuine issue respecting any material fact exists, and all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *Gallo v. Prudential Residential Services, Limited Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the non-moving party's case. *Id.* Finally, when no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper. *Id.*

### B. *The Breach Of Contract Claims*

D'Andrea argues that Rafla and Methodist are liable for two counts of breach of contract based on: (1) Methodist's failure to issue D'Andrea a certificate of satisfactory completion, and (2) interfering with D'Andrea's enjoyment of the benefits associated with the certificate it did issue him. Rafla argues that he is entitled to summary judgment on the breach of contract claim asserted against him because he was not a party to the contract between D'Andrea and Methodist. Methodist argues that it simply did not breach its contract with D'Andrea because it fully performed its obligations under the agreement, and furthermore, even if it did breach the contract, D'Andrea has not suffered any damages as a result.

#### 1. *Rafla*

When an agent acts on behalf of a disclosed principal, the agent will not be held personally liable for the principal's breach of contract, unless there is clear and explicit

evidence of the agent's intention to be bound by the contract. *Walz v. Todd & Honeywell, Inc.*, 195 A.D.2d 455, 599 N.Y.S.2d 638 (2d Dep't 1993) (holding that the president of a publishing company was not liable for the publishing company's failure to publish plaintiff's novel); *Mihalakis v. Cabrini Med. Ctr.*, 151 A.D.2d 345, 542 N.Y.S.2d 988 (1st Dep't 1989) (holding that plaintiff medical intern could not bring a breach of contract action against individual doctors where the hospital terminated plaintiff's educational program prior to its one-year expiration date).

■ Here, Rafla cannot be held liable for the alleged breach of the contract between Methodist and D'Andrea because he was not party to that contract. There is no allegation that Rafla signed this contract and D'Andrea has presented no evidence that Rafla intended to be bound by the terms of the D'Andrea–Methodist agreement. Therefore, Rafla is entitled to summary judgment on the breach of contract claims asserted against him.[6]

### 2. *Methodist*

#### a. *Failure To Include Language In Certificate*

■ D'Andrea argues that because Methodist issued him a certificate that did not say that D'Andrea had "satisfactorily performed the duties of the Resident position," Methodist breached a provision of the D'Andrea–Methodist contract, which said: "The Hospital shall issue the appropriate certificates of satisfactory completion...upon the...final year of... training." Methodist argues that it was not obligated to include the "satisfactorily performed" language in D'Andrea's certificate and that it fulfilled its obligations under the contract by issuing D'Andrea a certificate that read: "Mark A. D'Andrea has served as a Resident in Radiation Oncology...from July 1, 1986 through June 30, 1989...." Methodist also argues that even if it was obligated to include the "satisfactorily

performed" language in the certificate, D'Andrea has not shown that he has been harmed in any way by Methodist's failure to include this language in his certificate.

It is questionable whether the parties intended this term to be literally performed, and whether there were conditions precedent to obtaining the certificate D'Andrea desires. D'Andrea has presented evidence of other certificates which included the critical language and grounds for his reasonable expectation that this language would be in his certificate. Therefore, it would be inappropriate to grant Methodist summary judgment on the grounds that it has performed its obligations under the contract because there remains a genuine issue of material fact as to whether it did. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (holding that where the language used in a contract is susceptible to differing interpretations, the meaning of the words is an issue of fact precluding summary judgment).

■ However, there is no genuine issue of material fact as to whether D'Andrea has been injured as a result of the omitted language in his certificate—he has not. Under New York law, a plaintiff must prove the existence of damages with certainty in order to recover for breach of contract. *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852 (2d Cir.1987). Moreover, New York law "does not countenance damage awards based on speculation or conjecture." *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1010 (2d Cir.1991). Here, D'Andrea alleges in his complaint that,

> The purpose of this certificate is to enable the resident seeking to advance to the next step in his medical career to demonstrate to anyone that makes a three year residency training program in radiation oncology a prerequisite that he has in fact satisfactorily completed such a training program.

As Methodist argues in its brief, D'Andrea has failed to produce any evidence that his

---

**6.** Apparently as an afterthought, D'Andrea now claims that his complaint should be read liberally to construe his breach of contract claim as a claim against Rafla for tortious interference with the D'Andrea–Methodist contract. However, even if this strained construction were permitted,

a rational juror could not find Rafla liable on such a claim because Methodist neither actually breached its contract with D'Andrea, nor were its obligations under the contract rendered impossible by Rafla's actions.

career advancement has been hindered by the alleged deficient certificate. Indeed, D'Andrea himself admits that upon leaving Methodist, certificate in hand, he entered a practice with Dr. Schlictemeier in Texas where his contract entitled him to a salary of $130,000 in his first year, $180,000 in his second year, and $250,000 in his third year of employment with Schlictemeier. Therefore, D'Andrea certainly has not been injured in the compensation he was able to earn as a radiologist, and he does not allege that he was. While D'Andrea states in his brief that "[t]his is not the type of certificate employers (or other bodies to whom a resident need apply) expect to see," he has failed to show that he was denied any of the privileges or benefits associated with satisfactory completion of a residency program. Finally, D'Andrea cannot recover any damages for emotional and mental distress, damage to his reputation, or punitive damages under a breach of contract claim. *V.S. International, S.A. v. Boyden World Corporation,* No. 90–CV–4091 (PKL), 1993 WL 59399 (S.D.N.Y. March 4, 1993). Therefore, Methodist is entitled to summary judgment on D'Andrea's first breach of contract claim.

b. *Interference With Enjoyment Of Certificate*

██ D'Andrea next argues that because Methodist refused to stand by the certificate it issued him, it destroyed the value of the certificate and prevented D'Andrea from enjoying the benefits of it. D'Andrea points specifically to two letters by Rafla, one to the ABR and one to the East Texas Cancer Center, stating that in his opinion, D'Andrea needed an additional four months of training beyond his originally expected completion date.[7] Methodist argues that the contract did not confer a right upon D'Andrea to be recommended for specialty board certification.

██ Under New York contract law, every legally enforceable agreement contains an implied covenant of good faith and fair dealing. *Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741 (S.D.N.Y.1990) (citing *Rowe v. Great Atlantic & Pacific Tea*

Co., 46 N.Y.2d 62, 412 N.Y.S.2d 827, 830, 385 N.E.2d 566 (1978)). This covenant is breached when one party to the contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under their agreement. *Id.* (citing *Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir.1980)).

In a context similar to the one in this case, it was held that a residency program director's refusal to execute a certification of the plaintiff's good moral and ethical character, so as to permit the plaintiff to take a board certifying examination, was not a breach of an implied or express term of the residency program contract. *Meller v. Tancer,* 174 A.D.2d 374, 571 N.Y.S.2d 214, 215 (1st Dep't 1991). Moreover, in *Meller,* the court noted that:

> The courts of [New York] have consistently stated their reluctance to intervene in controversies involving educational and academic standards unless the institution exercised its discretion in an arbitrary or irrational manner or in bad faith. The judicial deference that has been given to educational and academic institutions has also been given to accredited residency training programs.

*Id.* at 216 (citations omitted) (holding that where plaintiff's residency file was replete with substandard evaluations, program director's refusal to execute board verification was not arbitrary and capricious or in bad faith); *see also Sumner v. Beth Israel Medical Center,* 196 A.D.2d 537, 601 N.Y.S.2d 144 (2d Dep't 1993) (finding no obligation on the part of residency program to recommend plaintiff to subspecialty board even after he completed residency program).

As D'Andrea argues, *Meller* and *Sumner* did not present the exact same facts as are present here. It is true that this case, unlike *Meller* and *Sumner,* centers on the hospital's failure to communicate that D'Andrea had completed, or was going to complete, the Methodist residency program. That is, D'Andrea's complaint is not that Methodist failed to certify him for ABR examination, an

---

**7.** Only the letter to the ABR has been provided to the Court.

unactionable claim under *Meller* and *Sumner*, but that Rafla sent the ABR letters contradicting D'Andrea's certificate of completion. Nonetheless, these distinctions between *Meller* and *Sumner* and this case are not meaningful.

Here, as in *Meller* and *Sumner*, Rafla simply gave the ABR his opinion as to whether D'Andrea would be prepared for certification upon completion of the Methodist program. Again, as in *Meller* and *Sumner*, he was not obliged to provide the ABR or the East Texas Cancer Center with anything other than his opinion as to D'Andrea's qualifications. Rafla's letters did not state that Methodist would require that D'Andrea spend four more months with the program or that he would not complete his residency program at Methodist. Indeed, it specifically indicated that Methodist would not require or allow D'Andrea to train for an additional four months at Methodist. It was actually the ABR's decision not to allow D'Andrea to sit for the oral examination and require him to train for four additional months. This is not a case where Methodist issued D'Andrea his certificate and then improperly made disparaging remarks about him to future employers. Here, Rafla rendered a good faith opinion on D'Andrea's preparedness which should have been anticipated by D'Andrea after Rafla's warnings to D'Andrea since his first year. Therefore, Methodist did not breach an implied or express term of the agreement it had with D'Andrea to deprive him of the benefits of the contract.

## C. Tortious Interference With Contractual Relations

■ D'Andrea argues that Rafla and Methodist intentionally interfered with D'Andrea's ability to perform the contract he had formed with the ABR by making it more time-consuming and expensive for D'Andrea to perform his obligations under this contract. Defendants argue that D'Andrea has failed to satisfy the elements of this cause of action [8] because he has not shown that there was an actual breach of any contract that might have existed between D'Andrea and the ABR.[9]

■ A cause of action for intentional interference with contractual relations requires a plaintiff to show the following elements: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach the contract or otherwise render performance impossible; and (4) damages to the plaintiff as a result of the breach. *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289 (1993) (citing *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956)). Judge Scheindlin of the Southern District of New York has recently observed that New York courts and federal courts in New York have provided inconsistent statements as to whether this cause of action requires an actual breach by the third party. *Museum Boutique Intercontinental, Ltd. v.*

8. Defendants also argue that this claim and the alleged intentional interference with prospective economic advantage are time-barred under the New York statute of limitations for such actions. This argument is meritless. Such actions are governed by a three-year statute of limitations. *Corto v. Lefrak*, 203 A.D.2d 94, 610 N.Y.S.2d 214, 215 (1st Dep't 1994) (citing C.P.L.R. § 214(4)). The New York Court of Appeals has held that such actions do not accrue until the plaintiff suffers injury. *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993). Here, the act which allegedly induced the ABR to require D'Andrea to train for four additional months was the June 12, 1989, letter stating that, in Rafla's opinion, D'Andrea needed additional training. Therefore, D'Andrea suffered damages on June 12, 1989, at the earliest. Since D'Andrea filed this action on June 11, 1992, it was filed at least one day before the

statute of limitations expired for both of these tort claims.

9. Defendants argue that there was not a valid contract between D'Andrea and the ABR. This Court finds that there is at least a genuine issue of material fact as to whether there was a binding agreement between D'Andrea and the ABR, since D'Andrea and the ABR acknowledge that there was an agreement by the ABR to certify D'Andrea upon completion of all of the ABR's requirements. However, the parties do not dispute that this agreement did not require D'Andrea to complete his residency program and only required the ABR to certify him upon D'Andrea's successful performance on the ABR examinations and satisfactory completion of residency training.

*Picasso,* 886 F.Supp. 1155, 1162 (S.D.N.Y. 1995). Relying on the Second Circuit's holding in *Enercomp, Inc. v. McCorhill Publishing, Inc.,* 873 F.2d 536 (2d Cir.1989), and the New York Court of Appeals's decision in *Kronos,* Judge Scheindlin reconciled this inconsistency by holding that

> while an allegation of breach is not an absolute prerequisite for the tort, in most cases improper intentional interference will generally be evidenced by a tortfeasor inducing a third party not to perform his contractual obligations to plaintiff.... If the third party has not breached the contract, however, a plaintiff must allege that defendant's actions induced the third party to somehow render performance impossible.... At the very least, defendant's improper interference must be severe enough to make the contract impossible to perform.

*Museum Boutique,* 886 F.Supp. at 1163 (internal citations and quotations omitted). *Museum Boutique* held that where performance of a contract was not substantially prevented by the defendant's action but only became very expensive to maintain, the allegations did not rise to the level of interference necessary to constitute tortious interference with contract. 886 F.Supp. at 1163. In *Enercomp,* the Second Circuit held that implicit in this tort is an element of wrongful or improper conduct, and the accurate communication of one person's position to another does not constitute improper conduct where the defendant has a duty to communicate his opinion to the third party. 873 F.2d at 541.

 In this case, no rational jury could conclude that Rafla tortiously interfered with the ABR–D'Andrea contract. Rafla's actions did not substantially prevent either D'Andrea or the ABR from performing under their contract. Rather, Rafla simply provided the ABR with a candid evaluation of D'Andrea's preparedness for the ABR oral

examination. It was his subjective opinion that this resident would do well with an additional four months of training. Nothing Rafla did independently impeded D'Andrea's or the ABR's performance of the contract. Concededly, the ABR made D'Andrea's performance more difficult when it decided to impose an additional four months of training as a prerequisite to examination. Even if D'Andrea had an obligation to complete his residency program under the D'Andrea–ABR contract,[10] Rafla's letter did not prevent D'Andrea from fulfilling the conditions of the contract in order to be certified. It made it more costly for sure; however, this does not constitute sufficient interference to make out a claim under this cause of action.[11] *Museum Boutique,* 886 F.Supp. at 1163. Therefore, defendants' motion for summary judgment must be granted on the tortious interference with contract claim.

**D. *Tortious Interference With Prospective Economic Gain***

D'Andrea next asserts a claim of tortious interference with prospective economic gain, arguing that Rafla, through his misrepresentations to the ABR, interfered with the business relationships D'Andrea had with the ABR, patients, and associates in his practice. Defendants argue that summary judgment in their favor is proper on this claim because D'Andrea has failed to show any prospective business relationships with which defendants interfered.

 In addition to protecting a party against a third party's unlawful interference with an executed contract as discussed in the previous section, New York recognizes a cause of action for interference with precontractual relations. *Gertler v. Goodgold,* 107 A.D.2d 481, 487 N.Y.S.2d 565, 572 (1st Dep't 1985). Under New York law, a claim of tortious interference with such prospective business relations requires a showing that

---

**10.** D'Andrea had no obligation under the ABR–D'Andrea contract to take on the additional four months of training.

**11.** In addition, D'Andrea himself chose to begin practicing rather than pursue additional training beyond June 30, 1989, when he learned that the ABR would not certify him in June, 1989. D'An-

drea's damages are associated with the time he had to take away from the practice he had developed after leaving Methodist. Rafla's letter did not prevent D'Andrea from completing his training beginning in June 1989, which would have avoided much of the alleged injuries of which D'Andrea complains.

the defendant interfered with business relations existing between a plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or improper. *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762 (2d Cir. 1995), *cert. denied,* 516 U.S. 944, 116 S.Ct. 381, 133 L.Ed.2d 304 (1995) (citing *Volvo N. Amer. v. Men's Intern. Pro. Tennis Coun.,* 857 F.2d 55, 74 (2d Cir.1988)); *Strapex Corporation v. Metaverpa N.V.,* 607 F.Supp. 1047, 1050 (S.D.N.Y.1985); *Pamilla v. Hospital for Special Surgery,* 223 A.D.2d 508, 637 N.Y.S.2d 689 (1st Dep't 1996). In *Volvo,* the Second Circuit stated that the tort usually involves interference with a business relationship not amounting to a contract even though some case law has suggested that the plaintiff must identify a particular contract or contractual negotiations that are the basis of the action. *Id.* (citing *El Greco Leather Prods. Co. v. Shoe World, Inc.,* 623 F.Supp. 1038, 1044 (E.D.N.Y.1985), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987)).

■ While New York courts continue to hold that the plaintiff must show that an actual contract would have been entered but for defendant's malicious, fraudulent, or deceitful acts, *Fine v. Dudley D. Doernberg & Co., Inc.,* 203 A.D.2d 419, 610 N.Y.S.2d 566 (2d Dep't 1994); *Gertler,* 487 N.Y.S.2d at 572; *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (1st Dep't 1987), the Second Circuit has held that the plaintiff must only show that particular prospective business relations were lost due to the defendant's improper interference. *Purgess v. Sharrock,* 33 F.3d 134, 142 (2d Cir.1994). At a minimum, therefore, it seems that this cause of action requires an allegation that defendant's conduct interfered with a particular prospective business relationship with a specific third party. *Winner v. Kryptonite Corporation,* 95–CV–247 (KMW), 1996 WL 84476 (S.D.N.Y. Feb. 27, 1996).

*Purgess,* a recent Second Circuit case particularly applicable to this one, held that judgment for defendants was improper where a plaintiff-physician brought a claim of tortious interference with prospective economic gain against a former hospital and physician with whom he was associated. 33 F.3d at 142. The plaintiff showed that the defendant hospital reported to a prospective employer of the plaintiff physician that he had been terminated by the defendant-hospital for specific incidents of malpractice, when in fact there never had been any formal finding that the plaintiff-physician had either caused or contributed to the problems of any patient he had treated at the hospital. *Id.* Evidence also showed that the plaintiff had the opportunity to work at an out-of-state hospital after being terminated but that he was prevented from obtaining this position when the defendants delayed in providing the out-of-state licensing board with the necessary information regarding his termination. *Id.* The Second Circuit held that given this evidence, the jury could reasonably have concluded that defendants used dishonest, unfair, or improper means in interfering with plaintiff's relationship with the prospective employer and the out-of-state board.

■ Here, the only specific business relationship that existed at the time of defendants' alleged improper interference was the relationship that D'Andrea had with the ABR. However, this relationship was neither precontractual nor prospective because, according to D'Andrea, he had an existing contract with the ABR. Indeed, this contract is the basis of his tortious interference with contract claim. It follows that D'Andrea's relationship with the ABR cannot serve as the basis for both a tortious interference with contract claim and a tortious interference with prospective business relations claim. Moreover, D'Andrea makes no allegation that Rafla interfered with any future relationship that had not already been formed between the ABR and D'Andrea. Therefore, to the extent that D'Andrea is asserting a tortious interference with prospective economic advantage claim against defendants based on their interference with his relationship with the ABR, the motion for summary judgment is granted.

D'Andrea points to no other existing business relationship with which Rafla interfered when he sent his June 12, 1989, letter to the ABR, except for his relationships with Dr. Schlictemeier and patients in his practice.

D'Andrea claims that he was forced to take time off from his employment with Schlictemeier over two years after Rafla sent letter. However, even if this could be the basis for an interference with economic advantage claim, D'Andrea makes no allegation whatsoever that this hindered his ability to obtain employment with Schlictemeier in the first place, further develop his business relationship with Schlictemeier, or obtain an employment contract with an employer other than Schlictemeier. If he is claiming that he was unable to perform his contract with Schlictemeier, which he does not allege in his complaint, the proper cause of action would be for tortious interference with contractual, not precontractual relations.

If, on the other hand, D'Andrea is claiming that Rafla's letter forced him to take time away from his practice with Schlictemeier, thereby interfering with potential relationships he might have developed with possible patients who might have come his way, his allegations are simply too speculative to form the basis for this cause of action. A cause of action for interference with prospective economic advantage contemplates a defendant who has interfered with specific precontractual relations or a prospective relationship between the plaintiff and a third party that would have proceeded to some sort of binding, if not contractual, relationship but for the defendant's interference. Here, D'Andrea alleges no specific business relationships from which he was unable to reap economic advantage as a result of Rafla's June 12, 1989, letter. He only points to possible referrals and earnings he might have gained had he chosen not to take off four months. This is insufficient to sustain a tortious interference with prospective economic advantage claim. Therefore, D'Andrea's situation is unlike the plaintiff physician's claim in *Purgess*.

Finally, despite D'Andrea's extensive efforts to show bad faith by Rafla when he wrote his June 12, 1989, letter, there is simply insufficient evidence for a rational juror to conclude that Rafla acted with the sole purpose of harming D'Andrea or by means that are dishonest, unfair, or improper. *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir.1995), *cert. denied*, 516 U.S. 944, 116 S.Ct. 381, 133 L.Ed.2d 304 (1995). While D'Andrea points to several pieces of evidence which he claims contradict Rafla's opinion as he presented it to the ABR, it is clear that Rafla's letter was grounded in facts that had been presented to him by Methodist physicians and administrators and his personal observations of D'Andrea's behavior during his residency. Even if Rafla was negligent in failing to confirm the veracity of all of the allegations presented to Rafla, this does not constitute Rafla's use of "means that dishonest, unfair, or improper."

Rafla's letter made a subjective recommendation that D'Andrea serve an additional four months as a resident. This opinion was based on Rafla's good-faith belief in three things: (1) D'Andrea had been absent for 102 days during 1988 after Rafla told Saleh to "be sure of [her] facts;" (2) D'Andrea performed poorly in his surgery rotation; and (3) D'Andrea declined to take the necessary steps to complete a rotation in pediatric radiation oncology, which had to be arranged through an outside hospital. Each of these factual bases was supported by documentation or statements by Methodist personnel. First, it is undisputed that Katherine Saleh reported to Rafla that D'Andrea had been absent for 102 days in 1988. It is true that Methodist's records actually indicated that D'Andrea was absent for 81.5 days. However, D'Andrea does not challenge that Saleh misreported D'Andrea's absences to Rafla in the first place.[12] Second, D'Andrea does not dispute that he received an abysmal evaluation from his surgery rotation which gave him an overall rating of "poor" and states

This resident['s] level of participation, compared to other residents[,] was nil. In fact[,] since I saw so little of him[,] some criteria are hard to evaluate.

---

12. D'Andrea devotes a substantial portion of his brief detailing why his absences during 1988 did not contravene the Methodist residency program policy. However, even if D'Andrea's allegations are true, he makes no allegation to support his argument of bad faith—that Rafla knew that D'Andrea had not exceeded the number of permissible absences.

D'Andrea only puts forth satisfactory evaluations from other Methodist physicians and earlier letters from Rafla himself that make no mention of the deficiencies Rafla mentions in the June 12 letter.[13] These other letters do not contradict Rafla's statement that D'Andrea performed poorly in his surgery rotation. Third, D'Andrea does not dispute that he failed to take a rotation in pediatric radiation oncology. Instead, D'Andrea argues that such a rotation was not required by Methodist. However, Rafla's letter does not state that the program was required; it simply states that D'Andrea chose to remain in clinical research against the suggestion of Methodist that he enter a rotation in pediatric radiation oncology and that he failed to take the steps necessary to complete this rotation. The ABR, not Rafla or Methodist, deemed such a rotation important enough to refuse to certify D'Andrea. Finally, Rafla had also learned that D'Andrea had mailed unauthorized information to the ABR, had performed very poorly on his internal examinations, and had received less than laudatory reviews from his clinical mentors. Therefore, defendants have shown that there is no genuine issue of material fact as to whether Rafla acted in good faith or for the sole purpose of harming D'Andrea by means that are dishonest, unfair, or improper.

### E. *Prima Facie Tort*

D'Andrea next asserts a cause of action for prima facie tort based on Rafla's actions in advising the ABR that he believed D'Andrea needed four more months of training and a rotation in pediatric radiation oncology. Defendants argue that they are entitled to summary judgment because: (1) D'Andrea does not allege special damages; (2) D'Andrea alleges the same facts that make out his other tort claims; and (3) this claim is time-barred. D'Andrea requests that in the event this Court finds he has not pleaded special

damages with sufficient particularity, the Court grant him leave to amend his complaint.

A prima facie tort claim requires the (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful. *Curiano v. Suozzi*, 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469, 469 N.E.2d 1324 (1984). Like an action for tortious interference with prospective economic advantage, an action for prima facie tort does not lie absent an allegation that the acts complained of were motivated solely by malice or to inflict injury. *Entertainment Partners Group, Inc. v. Davis*, 198 A.D.2d 63, 603 N.Y.S.2d 439 (1st Dep't 1993); *but see Chen v. United States*, 854 F.2d 622 (2d Cir.1988) (holding that the only difference between intentional tort and prima facie tort is that prima facie tort requires that the acts complained of be otherwise lawful but for defendant's malevolence while intentional tort involves means which are illegal and corrupt).

Moreover, a prima facie tort claim cannot rest on the same substantive acts on which a breach of contract or intentional tort claim rests. *Gertler v. Goodgold*, 107 A.D.2d 481, 487 N.Y.S.2d 565 (1st Dep't 1985) (dismissing prima facie tort claim where it rested on same factual allegations set forth for breach of contract, tortious interference with contract, and tortious interference with prospective economic advantage claims). Prima facie tort provides a remedy for intentional and malicious actions that cause harm and for which no traditional tort provides a remedy. *Curiano*, 480 N.Y.S.2d at 469, 469 N.E.2d 1324. Finally, allegations of round sums of damages without any attempt at itemization are not sufficient to constitute special damages. *Azby Brokerage*,

---

**13.** D'Andrea cites an April 25, 1989, internal personnel form in which Rafla rated D'Andrea as "good," a March 30, 1989, form for Florida medical licensure in which Rafla rated D'Andrea as "good" on almost every characteristic, and an April 11, 1989, form for Illinois medical licensure in which Rafla checked a box indicating that D'Andrea had successfully completed his training course. However, these forms are not inconsistent with the June 12 letter. None of these forms required Rafla to evaluate D'Andrea for subspecialty certification or discuss the sufficiency of D'Andrea's preparedness for an examination in radiation oncology. Moreover, it was not until after these forms were completed that Rafla learned of D'Andrea's improper conduct at Methodist, a fact which D'Andrea admits magnified the importance of D'Andrea's transgressions and which was fully disclosed in Rafla's letter to the ABR.

*Inc. v. Allstate Ins. Co.*, 681 F.Supp. 1084, 1088 (S.D.N.Y.1988) (holding that a general damages claim for lost commissions in the amount of "at least ten million dollars" was insufficient to allege special damages).

■ As an initial matter, this Court has already determined for purposes of D'Andrea's intentional tort claims that no rational jury could conclude that Rafla acted with malice or by improper, dishonest, or unlawful means. Therefore, D'Andrea has failed to allege grounds for a prima facie tort action. Furthermore, it is clear from D'Andrea's pleadings that he is alleging the same substantive acts as the basis for this claim as he alleged for his intentional tort and breach of contract claims. It has been said that "prima facie tort should not become a 'catch-all' alternative for every cause of action which cannot stand on its legs." *Gertler*, 487 N.Y.S.2d at 572 (citing *Curiano*, 63 N.Y.2d at 118, 480 N.Y.S.2d 466, 469 N.E.2d 1324). Finally, D'Andrea's allegation that he "suffered in excess of $200,000 in actual damages including but not limited to lost wages, lost patient referrals, decreased earnings potential, expenses incurred, lost bonuses, and lost vacation time," is insufficient to constitute special damages. Because this cause of action is fatally defective as currently pleaded, and there appears to be no basis for this claim, defendants' motion for summary judgment is granted and D'Andrea's motion to amend his pleadings is denied.

### F. *Invasion Of Privacy*.

D'Andrea claims that Methodist Hospital invaded his right to privacy when it used a photograph of him in a resident recruitment brochure without his permission, causing him mental distress and anguish. Methodist argues that it published two recruitment brochures with D'Andrea's photograph and that to the extent that D'Andrea's claim rests on the brochure that was disseminated in 1989, the claim is time-barred. Methodist does not dispute that D'Andrea may bring an invasion of privacy claim based on Methodist's dissemination of the later recruitment brochure.[14] Moreover, Methodist does not even take a position as to the date the later brochure was disseminated to the public.

■ New York Civil Rights Law § 51 provides a cause of action for any person whose picture is used for advertising purposes or for purposes of trade without the written consent of that party. Such a cause of action has a one-year statute of limitations commencing from the time the offending matter is disseminated to the public. *Castel v. Jean Norihiko Sherlock Corp.*, 159 A.D.2d 233, 552 N.Y.S.2d 212 (1990). The Second Circuit has held that under this "single publication rule," publication of one edition of the offending matter gives rise to one cause of action at the time of publication even though there may be several distributions of such matter. *Zuck v. Interstate Publishing Corp.*, 317 F.2d 727 (2d Cir.1963).

Here, D'Andrea concedes that any cause of action based on the earlier recruitment brochure was time-barred when he filed his claim in 1992. However, D'Andrea argues that his claim is based on the later brochure which he discovered less than one year before he filed this action. Therefore, Methodist's motion for summary judgment on D'Andrea's invasion of privacy claim is granted only to the extent that it pertains to the earlier recruitment brochure. Methodist's motion for summary judgment is denied to the extent that D'Andrea's claim rests on the later recruitment brochure.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted with regard to the breach of contract claims, the intentional interference with contract claims, and the intentional interference with prospective economic advantage claims. Methodist's motion for summary judgment on the invasion of privacy claim is granted only to the extent that it relies on the first recruit-

---

14. The parties make no allegations as to when this brochure was disseminated to the public, however, D'Andrea alleges that the brochure was published for the 1992 academic year, and D'Andrea first saw this brochure in 1992.

ment publication; as to the second publication, it is denied.

So Ordered.