MENARD M. GERTLER, Respondent, v JOSEPH GOODGOLD et al., Appellants.

First Department, April 4, 1985

**APPEARANCES OF COUNSEL**

*S. Andrew Schaffer* and *Ada Meloy* for appellants.

*Maurice N. Nessen* of counsel (*Michael J. Dell* with him on the brief; *Kramer, Levin, Nessen, Kamin & Frankel,* attorneys), for respondent.

**OPINION OF THE COURT**

SULLIVAN, J. P.

Defendants appeal from the denial of their motion to dismiss the complaint or, alternatively, for summary judgment dismissing the complaint.

Plaintiff, a practicing physician and tenured faculty member in the Department of Rehabilitation Medicine of New York University School of Medicine, instituted this action against New York University, the New York University Medical Center, which includes the School of Medicine, and three medical doctors who are faculty members and administrators of the School of Medicine, whom he claims, have, through a series of related incidents, "sought, without justification, to undermine [his] career and deprive him of the basic benefits and privileges

of his academic tenure". He seeks to enjoin the relocation of his office within the Medical Center's Institute of Rehabilitation Medicine and to recover compensatory and punitive damages totaling $4,150,000.

Alleging that the university is "obligated to provide adequate amenities and fair administrative conduct and decisions to provide [plaintiff] with 'full freedom in research and in the publication of results' ", the complaint sets forth four causes of action — breach of contract, intentional interference with contractual relations, intentional interference with prospective economic advantage, and prima facie tort. It further alleges that through a pattern of discrimination plaintiff has been deprived of five supposed contractual concomitants of his tenure, viz., adequate space for research, fair teaching assignments, nondiscriminatory treatment, cooperation in allowing and promoting research grants under discernible procedures, and adequate grievance procedures fairly administered under reasonably certain standards. Defendants deny that those so-called contractual concomitants are elements of any contract, and point to the university's bylaws and other governing documents for a general description of the actual attributes of academic tenure.

In both the complaint and affidavit submitted in opposition to the motion plaintiff alleges that the pattern of discriminatory acts began with the denial of teaching assignments in 1973, when Dr. Goodgold, one of the three individual defendants herein, became director of research at the Institute of Rehabilitation Medicine. Although he still had his research and a staff to assist him, plaintiff alleges, defendants gradually began to deprive him of all his academic perquisites. For instance, Dr. Goodgold would often fail to notify him of scheduled meetings at which presentations were to be made for research funding; on other occasions he was given such short notice that he was unable to prepare adequately. As a result, he was not given the opportunity to compete for grants on an equal basis with other staff members. In 1980 Dr. Goodgold allegedly attempted to prevent him from completing the application process for one grant and then, by a series of maneuvers, was able to undermine the application. In late 1980 and early 1981, according to plaintiff, defendants, without any prior discussion, withdrew their consent to a grant which had been approved by the National Institute of Health (NIH). At that time, plaintiff filed an unsuccessful grievance, the review procedures of which he describes as a parody of due process. In 1983, Dr. Goodgold allegedly effectively thwarted plaintiff's efforts to participate jointly in another NIH grant.

Plaintiff contends that this pattern of contractual breaches culminated in Dr. Goodgold's demand on April 2, 1984 that he and his five-person staff vacate, within 30 days, approximately 1,720 square feet of office and work space they had occupied for the past 12 years on the second floor of the Medical Center's Institute of Rehabilitation Medicine to take less space on a part-time basis on the ground floor. Plaintiff was permitted, however, to keep his 1,633 square feet of laboratory space. This relocation, he claims, will deprive him of the opportunity to conduct the advanced experiments in which he is engaged. Patients who furnish data for studies could not be seen, and his staff would certainly leave him. Thus, plaintiff contends, relocation would render meaningless his ability to research or teach — a basic tenet of academic freedom and the rationale underlying the tenure contract.

Three weeks after the demand that he vacate, plaintiff commenced this action and simultaneously sought pendente lite relief barring the relocation of his work space. Special Term denied the request for a preliminary injunction, and this court affirmed. In the interim defendants moved to dismiss the complaint for failure to state a cause of action and lack of subject matter jurisdiction, and on the further ground that plaintiff's claims are time barred. In the alternative, defendants sought summary judgment. Special Term denied the motion. Since we believe that the complaint fails to state a cause of action, we reverse and dismiss.

While the complaint recites a litany of academic and administrative grievances couched in terms of a violation of a contractual right to tenure or a tortious interference with that right, it is significantly devoid of any reference to the contractual basis of these privileges of tenure. For example, the main focus of the complaint is plaintiff's claim of a right to office space. This was the subject of his unsuccessful motion for a preliminary injunction. Yet, there is nothing in the complaint or the record to show that tenure guarantees a faculty member any office at all, much less space of his own choosing. As a matter of academic practice, according to the record, efforts are made to provide a faculty member with office space for his immediate needs, but offices are not awarded on the basis of seniority, experience or credentials.

Plaintiff premises his asserted contractual rights on the proposition that the notion of tenure is instinct with the obligation to provide faculty members with adequate research facilities, as well as other benefits commensurate with their position. While

tenure is a concept of some elasticity and, no doubt, the source of many rights, it cannot be the wellspring of every conceivable academic amenity and privilege. Nor can the university's academic and administrative prerogatives be impliedly limited by custom, or by a strained theory of contractual construction. "[I]mplied promises are to be cautiously and not hastily raised." (*Genet v President of Delaware & Hudson Canal Co.,* 136 NY 593, 608.) Indeed, the Court of Appeals has noted (*supra,* p 609) that "a promise can be implied only where we may rightfully assume that it would have been made if attention had been drawn to it * * * and that it is to be raised only to enforce a manifest equity, or to reach a result which the unequivocal acts of the parties indicate they intended to effect." This case is precisely the instance where such an assumption may not be made. The university has never expressly, by contract or otherwise, obligated itself to provide the amenities plaintiff claims, and thus has not relinquished its authority to make its own academic judgments and to administer and allocate its resources. The benefits which plaintiff seeks are undoubtedly perquisites of faculty life, but they are not contract entitlements.

■ Thus, notwithstanding the allegations of a deprivation of contractual concomitants, plaintiff's breach of contract claims against the university and the medical center fail to state a cause of action. While it is axiomatic that on a motion addressed to the sufficiency of a complaint the facts pleaded are presumed to be true and accorded every favorable inference (*Morone v Morone,* 50 NY2d 481, 484; *Cohn v Lionel Corp.,* 21 NY2d 559), allegations consisting of bare legal conclusions as well as factual claims flatly contradicted by documentary evidence are not entitled to any such consideration. (*Roberts v Pollack,* 92 AD2d 440, 444.)

Moreover, since the academic and administrative decisions of educational institutions involve the exercise of subjective professional judgment, public policy compels a restraint which removes such determinations from judicial scrutiny. (*See, Matter of Olsson v Board of Higher Educ.,* 49 NY2d 408; *James v Board of Educ.,* 42 NY2d 357; *Matter of Levy* [*City Univ. of N. Y.*], 88 AD2d 915, *affd* 57 NY2d 925.) This public policy is grounded in the view that in matters wholly internal these institutions are peculiarly capable of making the decisions which are appropriate and necessary to their continued existence. (*See also, Matter of Patti Ann H. v New York Med. Coll.,* 88 AD2d 296, *affd* 58 NY2d 734.) In *James* (*supra,* pp 358-359),

for instance, the court vacated the grant of a preliminary injunction temporarily staying the administration of an examination "as an unlawful interference with an educational policy judgment made by the appropriate school authorities in exercise of constitutional and statutory power."

The Court of Appeals recently reaffirmed this policy determination in *Torres v Little Flower Children's Servs.* (64 NY2d 119). The court (*supra,* p 125) rejected a claim which, in its essence, alleged educational malpractice, and, quoting *Donohue v Copiague Union Free School Dist.* (47 NY2d 440, 445), stated, "as a matter of public policy * * * courts should not entertain such claims because to do so 'would require the courts not merely to make judgments as to the validity of broad educational policies — a course we have unalteringly eschewed in the past — but, more importantly, to sit in review of the day-to-day implementation of these policies.'" Thus, courts have been meticulous not to "invade, and only rarely [to] assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and tenure, especially in institutions of higher learning" (*Matter of Pace Coll. v Commission on Human Rights,* 38 NY2d 28, 38; *accord, State Div. of Human Rights v Columbia Univ.,* 39 NY2d 612, 619; *Matter of Salomon v New York State Human Rights Appeal Bd.,* 70 AD2d 991).

This is not to say, however, that the academic and administrative decisions of an institution of higher learning are beyond all judicial review. If the claim involves a matter of contractual right it may, of course, be vindicated in an action of law. (*See, Matter of Golomb v Board of Educ.,* 92 AD2d 256.) Moreover, having accepted a State charter and being subject to the broad policy-making jurisdiction of the Regents of the University of the State of New York, a single corporate entity of which they are deemed a part (*see,* L 1784, ch 51; L 1787, ch 82; NY Const, art XI, § 2; *see also,* Education Law §§ 202, 214; *Moore v Board of Regents,* 44 NY2d 593; *Matter of Patti Ann H. v New York Med. Coll., supra*), private colleges and universities are accountable in a CPLR article 78 proceeding, with its well-defined standards of judicial review, for the proper discharge of their self-imposed as well as statutory obligations. (*See, e.g., Matter of Auer v Dressel,* 306 NY 427.) Thus, the judgment of professional educators is subject to judicial scrutiny to the extent that appropriate inquiry may be made to determine whether they abided by their own rules, and whether they have acted in good faith or their action was arbitrary or irrational. (*Tedeschi v Wagner Coll.,* 49 NY2d 652, 658; *Matter of Gray v Canisius Coll.,* 76 AD2d 30, 36.)

Courts have traditionally reviewed the actions of private institutions of higher learning where it is alleged that in its relations with the students or faculty the institution has failed to follow its own hearing or review procedures. (*See, e.g., Matter of Carr v St. John's Univ.*, 17 AD2d 632, *affd* 12 NY2d 802; *Matter of Kwiatkowski v Ithaca Coll.*, 82 Misc 2d 43.)

Since it is obvious that plaintiff cannot establish a clear contractual right to the amenities of tenure claimed, and the courts have a rather restricted role to play in reviewing the judgments of educational institutions, the host of internal administrative and academic determinations which he challenges are redressable, if at all, in an article 78 proceeding, not a plenary action. While conversion of a plenary action to an article 78 proceeding is permitted where, as here, jurisdiction of the parties has been obtained (*see,* CPLR 103 [c]), it is not warranted where the claims are barred by the four-month Statute of Limitations (CPLR 217) which governs article 78 proceedings. (*See, Colodney v New York Coffee & Sugar Exch.*, 4 AD2d 137, 140.) Generally, in determining the applicable Statute of Limitations, the form of the remedy determines the time limitation. (*Matter of Paver & Wildfoerster [Catholic High School Assn.]*, 38 NY2d 669, 672; *also, Sears, Roebuck & Co. v Enco Assoc.*, 43 NY2d 389, 394-395.)

Plaintiff contends that *Matter of Cromwell Towers Redevelopment Co. v City of Yonkers* (41 NY2d 1) removes his claims from the bar of the four-month Statute of Limitations. There, an untimely article 78 proceeding was converted to a contract action and the Statute of Limitations thereby extended to six years (CPLR 213 [2]). *Cromwell,* however, involved a municipality's attempts to tax a developer in contravention of the express provision of a contract granting the developer a tax exemption. Since "an actual and explicit contract was entered into between the parties" the court held that the six-year statute was applicable (*supra,* p 5). In stark contrast, plaintiff cannot point to any contract provision giving him the right to any particular amenity.

■ Since none of the wrongs alleged can survive the proper application of CPLR 217, plaintiff cannot escape the four-month limitation. With respect to the already approved NIH grant — the "dramatic focus" of the pattern of alleged breaches — the university withdrew its application on February 24, 1981, and, as already noted, plaintiff thereafter instituted a faculty grievance proceeding protesting that action. After a lengthy procedure the Provost, whose review was the final stage in the

university's appeals process, accepted the appeal committee's report indorsing the School of Medicine's Grievance Committee procedures as fair and reasonable, and affirmed the decision of the Dean of the School of Medicine who had adopted the Grievance Committee's finding that plaintiff was not entitled to any relief. Plaintiff was so notified by letter dated July 27, 1982. This action was not commenced until April 23, 1984, 21 months later.

Insofar as the claim to office space is concerned, Dr. Goodgold initially notified plaintiff on March 11, 1982 that his office was to be moved as part of a reorganization of the Department of Rehabilitation Medicine. Thus, the decision to move plaintiff's office was concededly made and communicated to him over two years before this action was commenced. Plaintiff contends, however, that the four-month time period did not begin to run on this issue until defendants made a determination on April 2, 1984 to "evict" him. At a meeting on April 15, 1982, one month after he was first notified, plaintiff advised Dr. Goodgold that he needed two years to effectuate the move. Dr. Goodgold promptly rejected this proposal as unreasonable. As is clear from the correspondence, the most recent notice provided to plaintiff on April 2, 1984 was, in fact, merely the culmination of a prolonged attempt to obtain his cooperation in carrying out the decision made two years earlier to move his office. That decision was final and binding. In any event, a request for reconsideration does not toll the Statute of Limitations. (*See, Matter of Lubin v Board of Educ.*, 60 NY2d 974.) "The rule that the four-month limitations period begins to run on the date that the determination to be reviewed becomes final and binding would be completely emasculated if the petitioner could extend the commencement of this period by merely requesting that reconsideration be given to a prior decision because it is asserted that the earlier decision was based upon facts which were misconstrued." (*Matter of De Milio v Borghard*, 55 NY2d 216, 222.) Nor, in the absence of a statutory right to further proceedings, will negotiations attempting to reopen the matter for further consideration extend the time within which to seek review. (*Matter of Seidner v Town of Colonie Bd. of Zoning Appeals*, 79 AD2d 751; *see also, Matter of Johnston v Curry*, 68 AD2d 991.)

The other allegations offered as evidence of the pattern of discrimination against plaintiff are not set forth in any detail and, in any event, also appear to be time barred. It is alleged, for instance, that Dr. Goodgold, presumably sometime after 1973, and apparently before the spring of 1980, "failed to give [plaintiff] timely notice of scheduled meetings," and "timely and

adequate explanations." Plaintiff also alleges that he was denied research assistants and "meaningful teaching assignments." He does not, however, proffer any internal rule or contractual provision, the violation of which would provide a basis for these complaints. Moreover, insofar as this record discloses, plaintiff never objected, nor did he ever invoke any internal grievance procedures as to these supposed deprivations. Indeed, although in his correspondence with the university on the NIH grant grievance and the office relocation matters, his counsel raised numerous complaints as to the manner in which plaintiff had been treated over the past decade, he never complained about these purported wrongs.

Thus, as to all of his complaints, plaintiff was apprised of the university's final determinations more than four months before this suit was instituted. Any subsequent correspondence by him or his counsel was merely an attempt at securing reconsideration of these decisions.

In addition, since plaintiff's claims of discriminatory practices revolve around his "duties * * * perquisites and working conditions", the university's faculty grievance review procedures were available to him. Yet, with the exception of only one of his disputes, i.e., the 1981 withdrawal of the NIH grant application, he failed to avail himself of this internal peer review mechanism. As to these matters, having failed to exhaust administrative remedies, plaintiff is now barred from seeking judicial review of the internal decisions of the university. (*See, Rieder v State Univ. of N. Y.*, 39 NY2d 845; *Matter of Madon v Long Is. Univ.*, 70 AD2d 913; *Matter of Womer v Trustees of Univ. of State of N. Y.*, 47 AD2d 572.)

■ Plaintiff's tort causes of action are equally deficient. Since he cannot point to a contract obligating the university to grant him the amenities he seeks the second cause of action — intentional interference with contractual relations — which is asserted against the individual defendants, should also have been dismissed. In the third cause of action plaintiff alleges that the individual defendants, by unjustifiably causing the medical center to withdraw an application for a research grant to which NIH had already committed itself, prevented him from receiving the grant and that Dr. Goodgold, by a series of deliberate delays, interfered with his planned contractual collaboration with a Cornell University colleague on another NIH grant.

In addition to protecting a party against a third party's unlawful interference with an executed contract New York recognizes a cause of action for interference with precontractual

490

relations "where a party *would* have received a contract but for the malicious, fraudulent and deceitful acts of a third party" (*see, Union Car Adv. Co. v Collier,* 263 NY 386, 401; *Susskind v Ipco Hosp. Supply Corp.,* 49 AD2d 915). The requirements for establishing liability for interference with prospective contractual relations are more demanding than those for interference with performance of an existing contract. (*Guard-Life Corp. v Parker Hardware Mfg. Corp.,* 50 NY2d 183.)

■ Plaintiff's allegations fail to establish the requisite elements of this cause of action. Not only is he confronted with the public policy restraints against judicial interference with the judgment of professional educators (*see, Torres v Little Flower Children's Servs.,* 64 NY2d 119, *supra*), but conclusory allegations, such as those under review, that a defendant "maliciously and deceitfully interfered with" the consummation of a contract, are clearly insufficient. (*Susskind v Ipco Hosp. Supply Corp., supra; see also, Turner Constr. Co. v Seaboard Sur. Co.,* 98 AD2d 88; *but see, Harden, S.P.A. v Commodore Elecs.,* 90 AD2d 733.) Moreover, and significantly, according to the university, and it is not denied, research grants are generally awarded to the institution, not the faculty member. Thus, the grant is not a contract personal to any individual.

■ The fourth cause of action, asserted against Dr. Goodgold only, and which plaintiff offers to withdraw without prejudice, alleges prima facie tort, based on plaintiff's failure to receive the NIH grants, the direction that he move his office, and the purported denial of amenities. Thus, plaintiff is alleging as the basis of a prima facie tort precisely the same substantive acts which he has pleaded in the first three causes of action. What is, in effect, a restatement of the complaint's breach of contract and intentional tort claims cannot be made to stand independently as a prima facie tort by the simple expedient of reducing the number of defendants. "Prima facie tort should not become a 'catch-all' alternative for every cause of action which cannot stand on its legs." (*Belsky v Lowenthal,* 62 AD2d 319, 323, *affd* 47 NY2d 820; *see also, Curiano v Suozzi,* 63 NY2d 113, 118.) Thus, for this reason alone, the fourth cause of action is fatally defective and should be dismissed.

Accordingly, the order of the Supreme Court, New York County (Grossman, J.), entered October 9, 1984, denying defendants' motion to dismiss the complaint should be reversed, on the law, with costs and disbursements, and the motion granted.

Ross, Bloom and Fein, JJ., concur.

Order, Supreme Court, New York County, entered on October 9, 1984, unanimously reversed, on the law, and the motion to dismiss the complaint granted. Appellants shall recover of respondent $75 costs and disbursements of this appeal.