DANIEL S. KIRSCHENBAUM, Plaintiff-Appellant, v. NORTHWESTERN UNIVERSITY, Defendant-Appellee.

First District (3rd Division)    No. 1—98—3059

Opinion filed April 12, 2000, *nunc pro tunc* December 29, 1999.

Raymond J. Smith, of Chicago, for appellant.

Sidley & Austin, of Chicago (Frederic J. Artwick and Eric S. Mattson, of

counsel), and Stephanie M. Graham, of Northwestern University, of Evanston, for appellee.

JUSTICE BURKE delivered the opinion of the court:

Plaintiff Daniel Kirschenbaum appeals from an order of the circuit court entering judgment in favor of defendant Northwestern University (Northwestern) and against plaintiff following a bench trial in a breach of employment contract action brought by plaintiff against Northwestern. Plaintiff contends on appeal that the trial court erred in (1) denying plaintiff's motion for substitution of judge; (2) ruling that Northwestern had not breached the tenure-based employment contract entered into between plaintiff and Northwestern; (3) failing to find a constructive discharge without cause; and (4) finding that the tenure-based employment contract did not obligate Northwestern to provide plaintiff with a reasonable annual salary and benefits. For the reasons set forth below, we affirm.

Plaintiff, a tenured professor of clinical psychiatry and behavioral sciences at Northwestern University Medical School (Northwestern's medical school), filed a two-count complaint in the chancery division of the circuit court against defendants Northwestern, Northwestern's medical school, and Northwestern University Medical Faculty Foundation (the Foundation) for breach of contract. Plaintiff alleged that defendants had failed to provide him with a salary as well as teaching and clinical responsibilities and research facilities. Count I, which sought specific performance, was dismissed for failure to state a claim. Count II, the remaining claim, sought damages for breach of the contract. The record indicates that plaintiff voluntarily dismissed Northwestern's medical school as a party prior to trial and did not seek to hold the Foundation liable at trial.

Attached to plaintiff's complaint, included in the record on appeal, are four documents which, the parties agree and the trial court found, comprise plaintiff's tenure-based employment contract (contract) with Northwestern. The first document is a letter to plaintiff dated August 24, 1990, from Dr. Donald Nutter, vice dean of Northwestern's medical school, which states in pertinent part:

> "I am pleased to inform you that [Northwestern] has approved your promotion to the rank of Professor of Psychiatry and Behavioral Science with the award of tenure.
>
> The effective date of this faculty action is September 1, 1990. Your term of appointment will be indefinite. The base salary with regard to tenure is zero. Your total salary will continue to be recommended annually by your department chairman.
>
> Service on the faculty at Northwestern includes teaching as as-

signed by your department chairman, research, and the performance of assigned administrative duties. These duties of the faculty, as outlined in the University and Medical School Faculty Handbooks, help to form the basis on which your performance will be evaluated."

The second document is a letter dated November 19, 1990, authored by Robert Duncan, provost of Northwestern, which informs plaintiff that Northwestern's board of trustees had approved Duncan's recommendation that plaintiff be "promoted to Professor of Psychiatry with tenure effective September 1, 1990."

The last two documents are the two handbooks referenced in Dr. Nutter's letter to plaintiff, entitled "Northwestern University Faculty Handbook" (the University Handbook) and "Northwestern University Medical School Faculty Handbook" (the Medical School Handbook). The University Handbook specifies, in pertinent part, that "[t]enure is signified by an appointment for an indefinite period." The Medical School Handbook also specifies, in pertinent part, that "[t]he award of tenure carries with it an indefinite term of appointment for all faculty members who receive this honor," and it defines the salary obligation undertaken by Northwestern in connection with tenure awarded to one of its medical school faculty members as follows:

"The financial obligation inherent in [Northwestern] granting tenure is defined as a base salary. A faculty member will be notified in writing by the dean at the time tenure is awarded regarding the level of the base salary. The base salary is usually zero for physician faculty members who are awarded tenure."

Subsequent to numerous pleadings filed by the parties, including a motion for summary judgment filed by Northwestern which was denied, this case was transferred from the chancery division to the law division of the circuit court for further proceedings and trial.

At trial, both parties agreed that plaintiff remained a tenured faculty member at Northwestern. The parties presented the following evidence, which chronicles the events preceding, during, and subsequent to plaintiff's tenure. In 1984, Northwestern had appointed plaintiff to its medical school faculty as a nontenured associate professor of psychiatry and behavioral sciences for a one-year term; postdating this term, plaintiff served a five-year nontenured term. Plaintiff conceded, and the evidence showed, that he was advised both orally and in writing that his appointment was for a tenure-eligible track position with a zero-base salary. Plaintiff was advised that, in accord with Northwestern's "zero-base salary policy," plaintiff would not receive any salary from Northwestern should he eventually be awarded tenure but that "there would be hopefully other sources of reimbursement for him."

In addition, plaintiff received a letter dated November 2, 1984, from Harold Visotsky, chair of the department of psychiatry and behavioral sciences at Northwestern's medical school, stating that plaintiff had been appointed to the

> "faculty of Northwestern University Medical School at the rank of Associate Professor of Psychiatry and Behavioral Sciences. This is a tenure eligible track position and the Northwestern University Medical School base salary is zero. ***
>
> You will be required to volunteer three hours per week of contributed service, which would be over and above that given for your salaried position, and you are expected to attend the monthly departmental meetings as scheduled. ***
>
> * * *
>
> The detailing of your salaried work assignments are necessarily condensed in this letter and the formal contract should be referenced as a more definite description of your conditions of employment.
>
> As part of your academic appointment, you will be expected to supervise clinical psychology and psychiatry residents and medical students, to conduct educational diagnostic seminars, and to serve on qualification and dissertation committees. In addition, you will be expected to continue your research work in obesity and health psychology. *** It is expected that this work will result in extramural grant submissions and funding, as well as publications in relevant journals."

Dr. Nutter testified that Northwestern's medical school had adopted a zero-base salary policy for its tenured licensed clinical faculty, which had been in place at least two years preceding plaintiff's appointment to Northwestern's medical school clinical faculty in 1985. Nutter testified that Northwestern had adopted its zero-base salary for its tenured clinical medical school faculty members for two reasons. First, Northwestern provided limited funds to its medical school and, therefore, its medical school and clinical departments lacked the financial resources to commit to the clinicians who receive tenure; in other words, Northwestern's medical school could not practically guarantee the salaries of its tenured clinical faculty members. Secondly, Northwestern's medical school faculty earned sizeable salaries from nonuniversity sources, including practice plans and teaching hospitals. As of 1997, according to Nutter, Northwestern's medical school was one of 20 medical schools that had awarded tenure in their clinical departments without attaching onto the tenure award any school financial obligation.

According to Dr. Nutter, who had participated in placing Northwestern's zero-base salary policy in the Medical School Handbook,

underlying Northwestern's zero-base salary for tenured medical school clinical faculty members were two salary components: a "base" salary described in the Medical School Handbook as "zero"; and a "total" salary, which referred to the total amount of salary paid to faculty members from Northwestern and all "approved" sources identified in the Medical School Handbook. According to Nutter, the approved sources included, in pertinent part, the Northwestern Memorial Hospital (the Hospital) and the Foundation, two distinct entities with which Northwestern had entered into affiliation agreements.

The evidence further revealed that plaintiff had received a salary from 1985 to 1992, not from Northwestern, but from the Hospital and the Foundation. Specifically, simultaneous with plaintiff's appointment in 1985 as an associate professor at Northwestern's medical school, plaintiff had signed a written employment agreement with the Hospital. The agreement stated that "[i]n consideration of the services to be performed by [plaintiff] pursuant to this Agreement, [the Hospital] shall pay to [Northwestern] the amount of $45,000 per year to be paid to [plaintiff] by [Northwestern]." In accordance with this agreement, plaintiff's salary was provided by the Hospital, even though his paychecks were issued by Northwestern pursuant to a previously arranged agreement between Northwestern and the Hospital. Under the agreement between Northwestern and the Hospital, the Hospital would reimburse Northwestern for all funds Northwestern disbursed to plaintiff. The evidence also showed that plaintiff knew that the Hospital, and not Northwestern, was the source of his salary, *i.e.*, a faculty action form that accompanied plaintiff's application for tenure in 1989 indicated that plaintiff's salary source was derived solely from the Hospital.

Pursuant to the plaintiff's employment agreement with the Hospital, plaintiff was required to devote approximately 40 hours each week counseling patients of the Hospital's eating disorders program, a program administered and funded by the Hospital. Plaintiff's employment with the Hospital continued into 1991, with the chairmen of his department (first Dr. Harold Visotsky and then Dr. Sheldon Miller) recommending his total salary each year.

Effective September 1, 1990, plaintiff was promoted from associate professor to full professor with tenure at Northwestern. According to Dr. Nutter, plaintiff was awarded tenure as a full-time member of a clinical department and as a health professional, and no financial obligation on Northwestern's part was attached to plaintiff's tenure award. Nutter, the author of the letter dated August 24, 1990, informing plaintiff that he had been granted tenure by Northwestern, testified that plaintiff never asked him what was meant by the language

used in the letter. Plaintiff, as a tenured professor, continued to teach and research and perform administrative duties for Northwestern and its medical school, and the department chair of Northwestern's medical school continued to recommend plaintiff's annual salary.

In the fall of 1991, due to financial troubles, the eating disorders program at the Hospital was transferred from the Hospital to the Foundation, which had a more favorable overhead structure. This transfer did not affect plaintiff's tenure with Northwestern. Rather, plaintiff's employment with the Hospital ended, and plaintiff signed a one-year nontenured employment contract with the Foundation with an annual salary of $86,000. Plaintiff's paychecks began to come directly from the Foundation. According to plaintiff, his duties at Northwestern continued to consist of supervision, research, teaching, developing grants, management administration, and publishing.

The record further reveals that the eating disorders program continued to lose money despite its transfer to the Foundation. In mid-1992, Dr. Miller, in his capacity as chairman of the department of psychiatry and behavioral sciences of the Foundation, told plaintiff that, as director of the program at the Foundation, plaintiff was responsible for the program's financial problems because he had not been generating enough revenue-clinical work. Consequently, as part of an effort to balance the program's budget, Miller further told plaintiff that his Foundation annual salary would be reduced to between $20,000 and $25,000. Dr. Miller also told plaintiff that, as department chair, he would be willing to negotiate plaintiff's Foundation salary upward if plaintiff, in exchange, would agree to increase his clinical load to generate more revenue and to offset some of the losses of the eating disorders program. Miller testified that plaintiff did not accept his offer, nor did plaintiff try to negotiate any terms of continued employment at the Foundation beyond September 1992. As a result, Miller did not renew plaintiff's contract with the Foundation, and it expired on October 1, 1992. The day before plaintiff's contract expired with the Foundation, plaintiff was denied access to all office space and equipment.

Dr. Miller emphasized that he never discharged plaintiff, that the nonrenewal of plaintiff's employment contract at the Foundation did not affect plaintiff's tenure status as a full clinical professor at Northwestern's medical school, and that plaintiff maintained his entitlement to conduct research through Northwestern should he develop a grant, submit it, and get it subsequently funded. Miller also stated that plaintiff remained eligible to work with willing graduate students in connection with conducting his research and also remained eligible to teach classroom courses. Dr. Miller further testified that he

was responsible for setting salaries for the faculty members under his supervision. When plaintiff's employment with the Foundation ended, Miller did not recommend any annual salary as of September 30, 1992, because plaintiff was no longer part of the Foundation system. Miller also recommended that plaintiff's appointment be changed from full time to "contributed service."

Dr. Nutter testified that Northwestern's medical school classifies each of its faculty members as either "full-time," "part-time," or "contributed service." The appropriate classification for each faculty member is determined by reference to the source of the faculty member's compensation. To qualify as "full-time," a faculty member must receive all of his professional compensation either from Northwestern or affiliated institutions such as the Foundation or the Hospital. A "part-time" faculty member is one who receives a portion of his total professional compensation from Northwestern or an entity approved by the medical school for specific, limited academic services. A "contributed service" faculty member is one who participates in the academic activities of Northwestern's medical school without direct financial compensation from Northwestern's medical school.

According to Dr. Nutter, a change in a faculty member's source of income can result in a corresponding change in the designated category of academic appointment. For example, when a "full-time" faculty member no longer earns his or her salary exclusively from Northwestern and any approved institution, the category of academic appointment must change either to "part-time" (if the faculty member continues to receive some compensation from Northwestern or an affiliated institution) or "contributed service" (if the faculty member no longer receives any compensation from Northwestern or an affiliate). Because a faculty member's category of academic appointment at Northwestern's medical school is purely a function of the source of his compensation, according to Dr. Nutter, it is not necessary to obtain the faculty member's consent before switching him from full-time status to part-time or contributed service status. Dr. Nutter specified that although only full-time faculty members are eligible to be awarded tenure in the first instance, a tenured faculty member can retain tenure after being switched to "part-time" or "contributed service" if the change in circumstances was not completely voluntary on the part of the faculty member.

The record shows that one month before plaintiff's Foundation contract expired, plaintiff signed an employment contract with the Rock Creek Center, a private medical institution not affiliated with Northwestern. Plaintiff's contract with the Rock Creek Center provided a total projected base income of $103,200, including benefits.

Dr. Nutter testified that because plaintiff received an appointment outside of the formal affiliates of the medical school, plaintiff was reclassified at Northwestern as "contributed service." Nutter emphasized that plaintiff was still a tenured faculty member at Northwestern and that there were other tenured faculty members at Northwestern's medical school besides plaintiff who were classified as contributed service.

In a letter dated April 20, 1994, included in the record on appeal, from plaintiff to Walter Burke, chair of Northwestern's division of psychology, plaintiff stated:

> "This week I was asked by a graduate student to serve on her Dissertation Committee. I was dismayed to discover that I am no longer on the departmental list of graduate faculty members. As you know, I am a tenured professor in the department and my appointment to the graduate faculty has not been rescinded.
> *** I realize that I am not employed via [Northwestern] or [the Foundation]."

Plaintiff conceded that Northwestern had taken no steps to revoke his tenured appointment before any faculty committee and he understood that tenure at Northwestern was governed by Northwestern's rules and regulations and not those of the Foundation or the Hospital. Further documentary evidence in the form of a letter dated December 2, 1997, from Dr. Nutter indicated that plaintiff's "appointment [was] unchanged from 1992; *i.e.*, [plaintiff was] a Contributed Service, Professor of Clinical Psychiatry and Behavioral Science, with Tenure," and plaintiff's "appointment continue[d] to be Tenured with an indefinite term of appointment." The record further reveals that plaintiff remained eligible to participate in the supervision of Northwestern graduate students and to have research assistants assigned to him and that, "to this day," remained a tenured faculty member at Northwestern's medical school.

After posttrial briefing and oral arguments, the court entered judgment in favor of Northwestern and against plaintiff. The court made findings of fact and conclusions of law and weighed the credibility of the witnesses. The court held that the contract documents unambiguously provided that Northwestern had no obligation to pay plaintiff a salary and the parol evidence supported its holding. Regarding the terms of the contract, the court stated:

> "i) the formal agreement entered into freely by the parties does not by its express terms guarantee plaintiff a salary from [Northwestern] sources; ii) 'economic security,' meaning a salary guaranteed from [Northwestern] sources, is not an implied term of the contract between the parties; and iii) tenure itself, for medical

school faculty, as a status, does not as a matter of law require as a necessary incident thereof the payment of an annual salary from university sources."

Regarding the parol evidence, the court stated:

"The circumstances proven at trial surrounding plaintiff's loss of a salary drawn from [Northwestern] sources demonstrate that any diminution in student contacts and access to [Northwestern] research facilities, etc., experienced by plaintiff is the result of his own actions rather than the product of misconduct on the part of [Northwestern's] officers and agents. It is clear from plaintiff's pleadings, testimony and the argument of his counsel that he has no intention or desire to return to faculty duties at the Northwestern University Medical School. What [plaintiff] wants, as he avers in his complaint, is to be paid for giving up tenure."

This appeal followed.

Plaintiff contends that the evidence manifestly showed that Northwestern breached the contract when it "discharged" him without cause by refusing to offer him a professorial position with salary and benefits for the 1992-93 academic year and in depriving him of "the badges and emoluments" of his tenured status. Plaintiff frames his argument as follows: "[Dr.] Miller's plan, to make [plaintiff's] working conditions unbearable in an effort to force him to resign, failed. [Plaintiff] refused to voluntarily give up his right under his tenure-based agreement of guaranteed annual income and benefits as long as he did not violate [Northwestern's] rules. A frustrated Miller, although he had no cause to do so, then decided to discharge him from [Northwestern] first by refusing to renew [plaintiff's] contract with the [Foundation] and then by refusing to make him an offer of a professorial position with salary and benefits for the academic year 1992-1993 at [Northwestern]."

■ A plaintiff's pleading "function[s] to frame the issues for the trial court and to circumscribe the relief the court is empowered to order." *Ligon v. Williams*, 264 Ill. App. 3d 701, 707, 637 N.E.2d 633 (1994); see also *Season Comfort Corp. v. Ben A. Borenstein Co.*, 281 Ill. App. 3d 648, 652, 655 N.E.2d 1065 (1995) (stating that "a party cannot plead one cause of action in its complaint and receive judgment on the basis of a different cause of action").

In the present case, plaintiff's contention fails for two reasons. First, the only claim presented before the trial court was the breach of contract claim set forth in count II of plaintiff's complaint, a claim asserted against Northwestern, the only remaining defendant in the case. Plaintiff had acknowledged at trial that the "evidence related to the Faculty Foundation is not offered to attempt to prove any cause of

action against the Faculty Foundation." Accordingly, before the court was plaintiff's complaint alleging that Northwestern, and not the Foundation or some other entity, had deprived him of a Northwestern salary or "teaching or clinical responsibility or facilities for research" in violation of his tenure agreement and that he had suffered compensable damages as a result. Plaintiff attempted to argue before the trial court, and continued to argue before this court, that Northwestern's liability should somehow be tied to plaintiff's contract with the Foundation. However, the trial court correctly found that "[t]o the extent plaintiff claims that [Northwestern] should be held liable for any contractual obligations owed to plaintiff by the Foundation, this claim has not been put in issue in the pleadings."

■ Secondly, plaintiff's contention fails because the trial court's judgment was not against the manifest weight of the evidence. An appellate court "will defer to the trial judge's findings of fact when they are dependent upon the credibility of witnesses, unless the findings are against the manifest weight of the evidence." *Athens v. Harris Trust & Savings Bank*, 297 Ill. App. 3d 1055, 1060, 697 N.E.2d 909 (1998). A ruling is against the manifest weight of the evidence when "the opposite conclusion is clearly apparent." *Reinneck v. Taco Bell Corp.*, 297 Ill. App. 3d 211, 219-20, 696 N.E.2d 839 (1998).

In the present case, following the bench trial on the merits of the sole remaining count of plaintiff's complaint against Northwestern, the trial court made the following pertinent findings, after hearing the testimony and weighing the credibility of the witnesses:

"Plaintiff must fail in his contract claim because no evidence was presented at trial to demonstrate that Northwestern University breached any express or implied contractual obligation it owed to plaintiff. ***

*** [T]hough plaintiff argued throughout the trial and in his post-trial brief that the source of his perceived problems with Northwestern University was his departmental chair, Dr. Sheldon Miller and a 'handful of men in positions of power in the Medical School' with whom presumably Dr. Miller was associated, *** no theory of conspiracy was pleaded in the complaint and no proof of conspiracy was presented at trial."

Our review of the evidence supports the trial court's findings. The testimony regarding Northwestern's obligation with respect to salary payments showed that Northwestern had awarded plaintiff an appointment of tenure in September 1990 which carried with it a zero-base salary. Further evidence showed that plaintiff had entered into contracts with two separate entities which provided him with his salary, namely, the Hospital and the Foundation. Plaintiff's contract with

the Hospital was executed in 1985 pursuant to which plaintiff was paid an annual salary until 1991, and the evidence showed that Northwestern had entered into an agreement with the Hospital whereby the Hospital, the source of plaintiff's salary and a distinct separate entity, would reimburse Northwestern for all funds disbursed to plaintiff. Plaintiff conceded that, in September 1991, a year prior to the alleged breach, he was taken off Northwestern's payroll when he entered into another employment contract with the Foundation. As a Foundation employee, plaintiff was paid his salary and provided with his fringe benefits directly from the Foundation.

Dr. Miller, the chairman of the department of psychiatry and behavioral sciences of the Foundation, which employed plaintiff, testified that he had made an offer of salary to plaintiff of $20,000 to $25,000 in mid-1992 but that plaintiff did not accept it and, therefore, Dr. Miller did not renew plaintiff's contract with the Foundation. Dr. Miller further testified that he was not trying to "get rid of" plaintiff. The trial court found Miller's testimony to be "credible." Juxtaposed against Miller's testimony was plaintiff's, and the trial court specifically found that plaintiff "was not a credible witness." This court cannot substitute its judgment for that of the trial court. See *Reinneck*, 297 Ill. App. 3d at 219.

Plaintiff further asserts that he was constructively discharged from his tenured position because Northwestern allegedly failed to provide him with certain intangible "benefits" of tenure such as teaching assignments, Northwestern support for research projects and grant proposals, and opportunities to participate in dissertation committees. Plaintiff's assertion is meritless. The evidence showed that these alleged "benefits" were duties and responsibilities that Northwestern's medical school faculty members, such as plaintiff, were expected to perform. The August 24, 1990, letter, which plaintiff agrees formed part of the contract, explicitly described the "benefits" of tenure *as responsibilities and not rights*. Specifically, the letter stated:

> "Service on the faculty at Northwestern includes teaching as assigned by your department chairman, research, and the *performance of assigned administrative duties*. These *duties* of the faculty, as outlined in the University and Medical School Faculty Handbooks, *help to form the basis on which your performance will be evaluated*." (Emphasis added.)

The Medical School Handbook stated, in turn, that "education, research, patient care, and University service" were "duties and responsibilities" of faculty members. Moreover, we note that plaintiff conceded in his own complaint that a tenured professor at Northwestern was "obligat[ed] to teach and promote the scholarly objectives of [Northwestern and its] [m]edical [s]chool."

We further note that plaintiff has failed in his burden to point to any provision of the contract that required Northwestern to provide him with certain intangible benefits of tenure. See *Williams v. Northwestern University*, 147 Ill. App. 3d 374, 379, 497 N.E.2d 1226 (1986) (noting that a plaintiff is required to plead and prove that a contract of tenure entitled him to the perquisites he claimed to have lost); see also *Williams v. Northwestern University*, 169 Ill. App. 3d 692, 694-96, 523 N.E.2d 145 (1988) (rejecting tenured professor's contract claim that he was entitled to "adequate laboratory facilities and equipment" where tenure documents did not reflect any agreement regarding professor's continued use of facilities at issue); *Gertler v. Goodgold*, 107 A.D.2d 481, 484-85, 487 N.Y.S.2d 565, 567-69 (1985), *aff'd*, 66 N.Y.2d 946, 489 N.E.2d 748, 498 N.Y.S.2d 779 (1985) (tenured medical school professor was not contractually entitled to adequate space for research, fair teaching assignments and cooperation in allowing and promoting research grants because these "benefits" were found to be "perquisites of faculty life" and not "contract entitlements"). In the present case, the evidence demonstrated that Northwestern was expressly obligated to provide to plaintiff under the terms of the contract only an indefinite term of appointment. The Medical School Handbook and the University Handbook describe tenure, respectively, as "carr[ying] with it an indefinite term of appointment" and as being "signified by an appointment for an indefinite period." Dr. Nutter's August 24, 1990, letter confirmed this aspect of the tenure policy undertaken by Northwestern's medical school. The evidence further demonstrated, and the trial court found, that Northwestern had done nothing to prevent plaintiff from pursuing all the scholarly activities available to its tenured medical school faculty. According to the record, plaintiff remained eligible to teach classroom courses in the medical school; to engage in research funded through Northwestern; to supervise Northwestern graduate students; to have research assistants assigned to him; and to sit on dissertation committees.

Moreover, contrary to plaintiff's assertion, the evidence does not show that Northwestern breached the contract when it unilaterally and involuntarily changed plaintiff's academic appointment from full-time to contributed service. Dr. Nutter, whom the trial court found "wholly credible," testified that when plaintiff signed a new employment contract with the Rock Creek Center, an appointment outside the formal affiliates of Northwestern's medical school, plaintiff's Northwestern academic appointment was reclassified from full-time to contributed service. Dr. Nutter emphasized, however, that plaintiff's reclassification did not affect plaintiff's status as a tenured faculty

member of Northwestern's medical school. In conclusion, the trial court's findings that Northwestern had "taken no steps to revoke or terminate plaintiff's tenured appointment" and that "[t]o this day, plaintiff remains a tenured professor at the Medical School" are not against the manifest weight of the evidence.

Plaintiff next contends that the trial court erred in determining that the contract was unambiguous with respect to Northwestern's nonobligation to provide plaintiff with a reasonable annual salary. Plaintiff frames his contention as follows: Northwestern had "persuaded the court below to stop reading the contract at the sentence[,] 'The base salary with regard to tenure is zero.' We ask this court to read and give effect to the very next sentence of the contract, providing for 'total salary,' which is to continue annually. Even though there was no base (fixed) salary, there clearly was to be compensation in the form of 'total salary.' It was the responsibility of the department chairman of the University's Medical School to recommend and assure a reasonable total salary, regardless of which source or sources available to the University were chosen to fund it." In response, Northwestern argues that the trial court correctly ruled that the unambiguous terms of the contract imposed no obligation on Northwestern to provide plaintiff a salary.

■ Where a contract is deemed to be unambiguous, a court is to determine the parties' intent by construing the language of the document itself. See *Farm Credit Bank v. Whitlock*, 144 Ill. 2d 440, 447, 581 N.E.2d 664 (1991). Contracts that specifically incorporate other documents by reference are to be construed as a whole with those other documents. See *Provident Federal Savings & Loan Ass'n v. Realty Centre, Ltd.*, 97 Ill. 2d 187, 193, 454 N.E.2d 249 (1983). The interpretation of a contract is a question of law to be determined *de novo* on appeal. See *Regnery v. Meyers*, 287 Ill. App. 3d 354, 360, 679 N.E.2d 74 (1997).

■ Tenure, although a protectable property interest, does not grant any greater rights, either substantive or procedural, than the policy that defines the term. See *Williams*, 147 Ill. App. 3d at 378; accord *Gray v. Mundelein College*, 296 Ill. App. 3d 795, 805, 695 N.E.2d 1379 (1998) (terms of faculty manual controlled over "custom and usage" evidence relating to the circumstances under which the defendant could terminate tenure); see also *Steinmetz v. Board of Trustees of Community College District No. 529*, 68 Ill. App. 3d 83, 87-88, 385 N.E.2d 745 (1978). Because tenure is a contractual interest, the specific rights and duties associated with it are contained in the parties' understandings. See *Williams*, 147 Ill. App. 3d at 378. A court must, therefore, "look to the tenure agreement to define the relationship be-

tween an educational institution and a tenured faculty member." *Williams*, 147 Ill. App 3d at 378-79.

■ Based on our review of the contract in the present case, we find that the four documents comprising the contract define the relationship between Northwestern and plaintiff as one whereby Northwestern awarded plaintiff an award of tenure as one of its medical school faculty members for an indefinite period with no financial obligation to plaintiff on Northwestern's part. The University Handbook specifies, in pertinent part, that "[t]enure is signified by an appointment for an indefinite period." The Medical School Handbook also specifies, in pertinent part, that "[t]he award of tenure carries with it an indefinite term of appointment for all faculty members who receive this honor" and it further defines and limits the salary obligation undertaken by Northwestern in connection with tenure awarded to one of its medical school faculty members. More specifically, the Medical School Handbook states:

> "The financial obligation inherent in the University granting tenure is defined as a base salary. A faculty member will be notified in writing by the dean at the time tenure is awarded regarding the level of the base salary. The base salary is usually zero for physician faculty members who are awarded tenure."

Moreover, vice dean Nutter confirmed in his August 24, 1990, letter that "[t]he base salary with regard to tenure is zero." Reading Nutter's letter further, as plaintiff asks us to do, Nutter informs plaintiff that plaintiff's

> "total salary will continue to be recommended annually by [plaintiff's] department chairman.
>
> Service on the faculty at Northwestern includes teaching as assigned by [plaintiff's] department chairman, research, and the performance of assigned administrative duties. These duties of the faculty, as outlined in the University and Medical School Faculty Handbooks, help to form the basis on which your performance will be evaluated."

A plain and fair reading of the pertinent documents comprising the contract between plaintiff and Northwestern shows that Northwestern appointed plaintiff to an indefinite term of tenure and that the only "financial obligation" Northwestern owed plaintiff was a "base salary," which was "zero." Nutter's letter then refers, in general terms, to an unspecified total salary that would be annually recommended by plaintiff's department chair and then speaks of plaintiff's duties, and Northwestern's expectations of plaintiff, as a medical school faculty member. Based on the plain language of the contract, we find that the trial court properly concluded that the contract "[did] not by its

express terms guarantee plaintiff a salary from [Northwestern] sources." Because we find that the contract is unambiguous, there is no need for this court to consider the parol evidence to determine the meaning of the contract. See, e.g., *Rymer v. Kendall College*, 64 Ill. App. 3d 355, 361, 380 N.E.2d 1089 (1978).

Nevertheless, we briefly observe that the parol evidence presented during trial supports the conclusion that the contract did not guarantee plaintiff a salary from Northwestern. The evidence showed that plaintiff knew that he would not be entitled to a salary from Northwestern should he attain tenure. Dr. Visotsky, the chairman of plaintiff's academic department and a Northwestern representative most involved in recruiting plaintiff to Northwestern, had notified plaintiff that his appointment to the faculty would be for "a tenure eligible track position" and that Northwestern's medical school's "base salary is zero." Dr. Visotsky testified that he had discussed the tenure policy at Northwestern's medical school with plaintiff and that he had "told [plaintiff] that he wouldn't receive any salary with his tenure if he became tenured." Further evidence revealed that Northwestern's medical school had adopted its zero-base salary policy years before plaintiff accepted his tenure award and that plaintiff had accepted his tenure award without objection to any of the language included in the documents comprising the tenure-based agreement.

Plaintiff, by subsequently accepting tenure at Northwestern, struck a bargain with Northwestern in connection with his award of tenure and he cannot now alter the terms of that bargain through his own self-serving testimony, testimony that the trial court found incredible. See *Frydman v. Horn Eye Center, Ltd.*, 286 Ill. App. 3d 853, 858, 676 N.E.2d 1355 (1997) (noting that "language in a contract is not rendered ambiguous merely because the parties disagree upon its meaning," and that "a court cannot rewrite a contract to provide a better bargain to suit one of the parties"). In an effort to alter the plain terms of the contract, plaintiff argues before this court, as he did at trial, that tenure included a component of economic security and the trial court erred as a matter of law in finding otherwise. Plaintiff, relying on a statement issued in 1940 by the American Association of University Professors (the 1940 Statement), argues that tenure always provides economic security, not just academic freedom. Plaintiff points to a portion of the 1940 Statement that provides that tenure is, in part, a means of guaranteeing "a sufficient degree of economic security to make the profession attractive to men and women of ability."

Plaintiff's reliance upon the 1940 Statement is without merit. According to the 1940 Statement, which is included in the record, "[t]enure is a means to certain ends; specifically: (1) freedom of teaching

and research and of extramural activities; and (2) a sufficient degree of economic security to make the profession attractive to men and women of ability." Contrary to plaintiff's suggestion, the parol evidence showed that Northwestern's medical school had never endorsed or adopted the "economic security" prong of the 1940 Statement's definition of tenure. Moreover, we note that while the University Handbook adopted the "academic freedom" prong, it omitted any reference to the "economic security" prong. Similarly, the Medical School Handbook contained no reference to the "economic security" concept on which plaintiff relies. Such omissions signify that Northwestern did not adopt the "economic security" concept of tenure. See *Klemp v. Hergott Group, Inc.*, 267 Ill. App. 3d 574, 581, 641 N.E.2d 957 (1994) (stating that there "is a strong presumption against provisions that easily could have been included in the contract but were not," and a "court will not add another term about which an agreement is silent").

In conclusion, we find that the unambiguous terms of the contract executed by plaintiff and Northwestern, terms that were corroborated by the parol evidence, support the trial court's holding that Northwestern did not breach any express or implied contractual obligation it owed to plaintiff.

For the reasons stated, we affirm the circuit court's order awarding judgment and costs in favor of Northwestern and against plaintiff.

Affirmed.

CAHILL, P.J., and WOLFSON, J., concur.