Matter of Ebert v Yeshiva Univ. (2004 NY Slip Op 24249)

Matter of Ebert v Yeshiva Univ.

2004 NY Slip Op 24249 [4 Misc 3d 699]

July 8, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Friday, November 5, 2004

[*1]
In the Matter of Yisroel Ebert, Petitioner,
v
Yeshiva University, Respondent.
Supreme Court, New York County, July 8, 2004

APPEARANCES OF COUNSEL

Jeffrey M. Duban, New York City, for petitioner. Sive, Paget & Riesel, P.C., New York City (Daniel Riesel and Elizabeth A. Read of counsel), for respondent.

{**4 Misc 3d at 700} OPINION OF THE COURT

Herman Cahn, J.[FN1]

Pursuant to CPLR article 78, petitioner Yisroel Ebert seeks an order: (i) annulling disciplinary action taken against him by respondent Yeshiva University (YU); (ii) reinstating Ebert as a student in good standing; (iii) removing all references to Ebert's expulsion from his record, with certification of compliance from the court; and (iv) allowing Ebert to complete courses for which he received grades of "incomplete" and "withdrawal."
Ebert was a full-time student at YU's Sy Sims School of Business, with less than two semesters remaining to graduation. On November 21 or 22, 2003, two students went to his dorm room to demand that he apologize to a young woman, to whom he had made insulting remarks. Ebert called the young woman and left a message of apology on her answering machine. As the other students were leaving the room, a fight broke out between them and Ebert. According to the other students, Ebert instigated the fight suddenly and without provocation. Ebert maintains that he only hit one of the students in self-defense after they threatened him with a broom and hit him.
This apparently was not the first instance of fighting/attack in which Ebert had been involved.
On Sunday, November 23, 2003, YU's associate director of security, Ernest McNamee, interviewed Ebert and the two other students. Based on those interviews, McNamee determined that Ebert had struck one of the students in the face without provocation or warning.
On Monday, November 24, 2003, YU's dean of students, David Himber, and senior university dean of students, Efrem Nulman, interviewed each of the three students about the incident. At that time, Nulman, acting as a hearing officer, informed Ebert that he was charged with an unprovoked attack on another student and that the meeting was Ebert's opportunity to be [*2]heard on the issues. Nulman also gave Ebert a copy of the YU undergraduate disciplinary rules (UDRs).
The UDRs state that students are prohibited from causing damage to property or harming others. Students who violate the rules are subject to disciplinary action after completion of an informal disciplinary interview. In addition, the senior{**4 Misc 3d at 701} university dean of students may immediately suspend the student pending completion of the procedures. (See Himber affidavit, exhibit A.)
The University's disciplinary procedures are "designed to provide students with fundamental fairness." In particular, the UDRs provide that the rules of civil or criminal procedure do not apply, and, therefore, students are not entitled to have an attorney or other advocate present at the disciplinary interview. The University, however, must notify the student of the exact charges and afford the student reasonable notice of the time and place of the interview. The student is also entitled to prepare an oral and written defense. Following the interview, the hearing officer will consider the facts and circumstances of the matter, make a determination, and impose appropriate sanctions.[FN2]

The student may then appeal the decision to the vice-president of academic affairs. (See Himber affidavit, exhibit A.)
After Nulman and Himber interviewed Ebert, they met with other YU administrators and unanimously agreed that Ebert, given the nature of this incident and previous disciplinary problems, should be expelled from the University. (Himber affidavit ¶ 10.) Shortly before noon on November 24, 2003, Ebert was called back into Nulman's office and informed of the decision. Ebert was given until the end of the day to choose between: (i) voluntary withdrawal, in which case the disciplinary reason for the withdrawal would not be indicated on his academic records, or (ii) expulsion, which would remain on his permanent record, but from which he could file an appeal.
Ebert immediately chose to voluntarily withdraw. That afternoon, Himber contacted Ebert's father and informed him of the events. Later that same day, Ebert's father met with Himber and requested additional time to consider the options. Himber gave them an additional day to decide. The following day, Ebert informed Himber that the voluntary withdrawal could be processed, but that Ebert would speak with individuals "higher up" in the school. (Himber affidavit ¶ 14.)
Ebert claims that he was forced to sign a "voluntary" withdrawal under threat and coercion, and seeks mandamus to review the actions of the University in eliciting his voluntary withdrawal. "The standard [in a mandamus to review] proceeding{**4 Misc 3d at 702} is whether the agency determination was arbitrary and capricious or affected by an error of law." (Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs., 77 NY2d 753, 758 [1991].) Courts will not generally substitute their own views for those of a respondent educational institution (Hutcheson v Grace Lutheran School, 132 AD2d 599 [2d Dept 1987]). Indeed, judicial policy regarding educational decisions reflects the belief that the university is, for the most part, better suited to make decisions regarding its own internal affairs. (See Maas v Cornell Univ., 94 NY2d 87, 92 [1999].) However, universities are not beyond judicial review. Under CPLR article 78, such institutions, even private ones, are accountable for the proper discharge of their self-imposed and [*3]statutory obligations (Gertler v Goodgold, 107 AD2d 481, 486 [1st Dept 1985], affd 66 NY2d 946 [1985]). The courts, thus, retain a "restricted role" by scrutinizing only whether the university abided by its own policies and whether it acted in good faith (id. at 487).
The UDRs promulgated by respondent itself require it to inform Ebert of the specific charges and to provide him with reasonable notice of the interview in order to afford him an opportunity to formulate an oral and written defense. (Himber affidavit, exhibit A.)
The incident occurred on a Friday or Saturday. On the following Monday, Ebert was called into a meeting at which he was informed of the specific charge and that the meeting would be his sole opportunity to speak on his own behalf. At this time, Ebert was also given a copy of the UDRs. This procedure violated the guidelines set out in the UDRs themselves. Ebert was not given adequate time to prepare for the interview; in particular, he had no chance to formulate a written defense. Moreover, giving Ebert a copy of the UDRs immediately before they would be applied violates a basic standard of fairness. Taken together, the University's actions constituted a failure to follow the guidelines set forth in the UDRs.
YU maintains that its guidelines were followed in that Ebert was informed of the charges against him, he appeared and gave a defense at the meeting, and he was informed of his right to appeal. To support its contentions, YU cites Matter of Trahms v Trustees of Columbia Univ. (245 AD2d 124 [1st Dept 1997]).
YU's reliance on this case is misplaced as the actions of YU do not resemble the actions taken in Trahms. In Trahms, the petitioner was informed of the charges against him in a meeting four days before the scheduled hearing; he orally acknowledged{**4 Misc 3d at 703} that he had adequate notice of the hearing and charges; and he had the opportunity to produce two witnesses to give testimony. Therefore, the court did not find any evidence of prejudice due to inadequate notice. (Id. at 125-127.) Here, there is no indication that Ebert had advance notice of the disciplinary interview and the exact charges against him, or that he knew of the procedures upon which the decision to expel him would be made.
The court is cognizant of a university administrator's need to sometimes take expeditious action for the safety (or perceived safety) of other students. However, the power to immediately suspend an unruly student is sufficient to afford such protection. Proper notice of charges and an opportunity to prepare a defense is certainly a right of all, and should not be easily taken away. Further, the UDRs prohibit a student's having an advocate of some sort present at the disciplinary proceedings. The issue of whether this comports with fundamental due process and fairness has not been raised here, and so the court is not called upon to rule thereon. However, it seems prudent for a student who is facing serious disciplinary charges, which might even lead to expulsion, to have an advocate of some sort present with him, to advise and counsel.
The matter is remanded to the University for a hearing in accordance with the guidelines promulgated by the UDRs. (CPLR 7806.) The hearing should be expeditiously held, so that a decision can be rendered before the commencement of the fall semester. It would seem that five days' actual notice is certainly adequate for the purposes of this proceeding.
The UDRs state that the senior university dean of students (Nulman) has the right to immediately suspend students pending completion of disciplinary procedures. (See Nulman affidavit, exhibit A.) Ebert, thus, had no legal right to remain in classes until the resolution of the matter. (See Matter of Marks v Regents of Univ. of N.Y., 279 App Div 476, 478 [3d Dept 1952].) Therefore, the request for reinstatement as a student in good standing is denied.
[*4]
Furthermore, Ebert's voluntary withdrawal, albeit coerced, obviates his request for an order striking all references to his expulsion from his record. From the statements of both Ebert and YU, this court's understanding is that there should currently be no such references in his record.
Finally, since this matter is remanded to the University, the request that the court review how and why YU gave Ebert grades of "incomplete" and "withdrawal" is premature. This{**4 Misc 3d at 704} court retains the apposite "restricted role" vis-à-vis Ebert's application. (See Maas v Cornell Univ., 94 NY2d at 92 [1999]; Gertler v Goodgold, 107 AD2d at 487.)
Accordingly, it is hereby ordered and adjudged that the petition is granted to the extent of remanding the matter to Yeshiva University for a new hearing, with adequate notice, and it is otherwise denied.

Footnotes

Footnote 1: The undersigned is a graduate of Yeshiva University High School and of its Erna Michael (Hebrew) Teachers Seminary. The latter graduation was in 1952.

Footnote 2: The UDRs state that "[s]anctions may include letters of admonition, probation, loss of privileges, suspension or expulsion from housing or from the school." (Himber affidavit, exhibit A.)